878 So.2d 582 (2004)
STATE of Louisiana
v.
Toxie R. ODOM.
No. 2003 KA 1772.
Court of Appeal of Louisiana, First Circuit.
April 2, 2004.
*585 Walter Reed, District Attorney, Covington, Dorothy A. Pendergast, Special Appeals Counsel, Metairie, for State of Louisiana.
Martin E. Regan, Jr., Kris A. Moe, Regan & Associates, P.L.C., New Orleans, for Defendant-Appellant Toxie R. Odom.
Before: CARTER, C.J., PARRO, and GUIDRY, JJ.
PARRO, J.
The defendant, Toxie R. Odom, was charged by bill of information with aggravated battery, in violation of LSA-R.S. 14:34. Defendant pled not guilty. After a jury trial, defendant was found guilty of the responsive offense of second degree battery in violation of LSA-R.S. 14:34.1. He was sentenced to five years of imprisonment at hard labor.[1]
On appeal, defendant relies on six counseled assignments of error and one pro se assignment of error for reversal of his conviction and sentence, as follows:

Counseled Assignments of Error
1. The jury's responsive verdict of second degree battery was unsupported by constitutionally sufficient evidence, and the evidence did not support the aggravated battery charge.
2. The trial court abused its discretion in denying a request to strike the jury panel or order a mistrial after some jurors indicated that they had seen Odom prior to voir dire, and abused its discretion in denying Odom permission to remove the prison armband.
3. The trial court abused its discretion in allowing Deputy Hickman's opinion testimony as to the progression of bruising of his own "black eye."
4. The trial court impermissibly allowed the prosecutor to lead Elena Odom in her description of her injuries.
5. The trial judge abused his discretion in sentencing Odom to the maximum sentence.
6. The commitment erroneously states that Odom was convicted of aggravated battery.

Pro se Assignment of Error
The trial court erred in denying the motion to [q]uash filed by defendant asserting his constitutional right to a speedy trial.
For the following reasons, we affirm defendant's conviction. However, having identified patent sentencing error, we vacate defendant's sentence and remand for resentencing.

FACTS
On Saturday, June 2, 2001, Elena Odom got up around 8:00 a.m. at her home in Angie, Louisiana, where she lived with her children, her husband, and her husband's aunt. When Elena's husband, the defendant, woke up, he began complaining about past grievances. According to Elena, he was on a "rampage," hitting her and kicking her with his fists and feet. He destroyed many of her personal belongings, pulled drawers out of furniture, broke pictures, and threatened to burn pictures of her deceased parents. In an effort to keep the children from witnessing the violence, defendant's aunt left the house with the children. The children were crying and wanted Elena to leave with them. Elena was afraid to leave, because defendant was *586 threatening to burn her new car and she was concerned that, if she left, he would destroy the car and/or their trailer. She complied with defendant's request to take a ride with him. Elena got into defendant's car and he drove "crazy" toward Varnado, Louisiana, threatening to kill her as they traveled the route. Afterward, they returned home and defendant located a .380 caliber pistol Elena kept for protection at the beauty salon she owned and managed. Defendant, still in a rage, began shooting at the floor and walls, threatening her with the gun. Then he took her for another ride toward Varnado, still armed with her pistol. During the ride home, when Elena would not answer questions about a brief affair she had while defendant was in prison, defendant began hitting her in the head repeatedly with the handle of the pistol.
Back at the house, defendant fired the gun at Elena's new car. She watched as he got under the hood of the car and she saw the car catch on fire. The fire department was called to put the car fire out. Defendant stayed outside when the firemen arrived and Elena remained inside, trying to put the house back in order. She did not call out to them for help because she was afraid. Elena spoke to her brother on the phone, telling him that she and the defendant were having a confrontation and that her car was on fire, but she did not want him to come to the house while defendant was there. Later defendant took money from her purse and demanded that she write out a check to him. At that point, he left in his truck. Once defendant departed, she called her brother to come to her aid.
When Elena's brother, Kenneth Kellehan, arrived, he could see gunshot holes in the floor of the home. Elena was upset, crying, and very frightened. He suggested that she gather up clothes for herself and her children and offered to let her stay with him because he was afraid for her safety. Before Kenneth arrived and while he was there, Elena nervously tried to clean up the mess made by defendant's "rampage." Kenneth explained that his sister was a "neat freak." He kept urging her to leave with him. When they finally left the home, they went to the Sheriff's Office in Bogalusa to report the incident.
Close to midnight, Washington Parish Sheriff's Deputy Chris Hickman took Elena's complaint at the Bogalusa substation. He observed bruises on her arms and legs and a cut on her head. Elena seemed afraid to talk to him, but she did tell him that the weapon used in the battery was a .380 caliber pistol. Afterward, Kenneth went with his sister to get her children and took them all home with him. He testified that he had first aid training and made sure that she stayed up all night in case she had a concussion.
At trial, Elena testified that as a result of the battering, her face was black and blue. She also had bruises on her leg from a picture frame defendant threw at her, and her arms were bruised from his actions in grabbing and hitting her. Elena described the cut on her head caused by defendant hitting her with her gun. She explained that she did not go to a doctor because she was embarrassed. She further described getting into the Jacuzzi tub at her brother's home the following week and how her whole body hurt for days after the incident. Pictures taken at the police station were introduced into evidence as State Exhibit Nos. 1-4. Other pictures, which reportedly showed the injuries as more severe, were given to her divorce attorney. Elena returned to work the following Tuesday, with her face still showing the bruises caused by the defendant. Tracey Hayden, one of Elena's employees, confirmed that when Elena returned *587 to work, the area under her eye was black, swollen, and puffy. She also had a gash on her head.
The only witness called by the defense was Rodney Thomas, Jr. Thomas testified about a time when he went to Elena's shop for a haircut and saw her with discolored eyes and a mark on the bridge of her nose, as though she had been hit. He asked her about her appearance and she told him that her husband had "head butted" her when she told him about an intimate relationship she had with another man while defendant was in prison.[2] According to Thomas, he told her that she was crazy to tell the defendant about the incident. Thomas admitted that he was not sure exactly when this conversation occurred and could not be certain that the injuries he observed were the same injuries sustained in the June 2, 2001 incident at issue. He also claimed that when he advised Elena that he planned to testify about this conversation, she suggested that it would be best if he said that he could not recall anything.
Defense counsel attempted to make it appear that the conversation between Elena and Thomas occurred after the June 2, 2001 incident. Since Elena had denied talking to Thomas after the June 2 incident during her earlier testimony, the testimony of Thomas was offered in an attempt to impeach Elena and cast doubt on her credibility. However, the state called Elena back to the stand in rebuttal. She testified that the incident described by Thomas was a separate incident that had taken place several months before the June 2 altercation. Elena also denied telling Thomas to say he did not remember anything. She testified that she told him to tell the truth.
At the conclusion of trial, the jury unanimously found defendant guilty of the responsive offense of second degree battery.

ASSIGNMENT OF ERROR NUMBER ONE
Defendant contends the evidence adduced at trial was insufficient to support his conviction of second degree battery. We do not agree.
The standard of review for sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could conclude the state proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. State v. Wright, 98-0601 (La.App. 1st Cir.2/19/99), 730 So.2d 485, 486, writs denied, 99-0802 (La.10/29/99), 748 So.2d 1157, and 00-0895 (La.11/17/00), 773 So.2d 732. In this case, defendant was convicted of second degree battery. Louisiana Revised Statute 14:33 defines battery as the intentional use of force or violence upon the person of another. Louisiana Revised Statute 14:34.1 further defines second degree battery as a battery committed without the consent of the victim when the offender intentionally inflicts serious bodily injury. As specified in LSA-R.S. 14:34.1, serious bodily injury means bodily injury which involves unconsciousness, extreme physical pain or protracted and obvious disfigurement, or protracted loss or impairment of the function of a bodily member, organ, or mental faculty, or a substantial risk of death. In order to prove a second degree battery, the state had to prove that the defendant: (1) committed a battery upon his wife, (2) without *588 her consent, and (3) intentionally inflicted serious bodily injury. State v. Young, 00-1437 (La.11/28/01), 800 So.2d 847, 852.
It is undisputed that defendant intentionally committed a battery. It is also clear that Elena did not consent to the battery. Moreover, there is no evidence to suggest that Elena did anything to physically threaten the defendant that would have justified him in striking her repeatedly with the handle of a pistol and with his fists and feet. Defendant insists, however, that the jury could not reasonably conclude, based on the evidence presented, that the injury to Elena was serious.
The trier of fact is free to accept, in whole or in part, the testimony of any witness. State v. Johnson, 99-0385 (La.App. 1st Cir.11/5/99), 745 So.2d 217, 223, writ denied, 00-0829 (La.11/13/00), 774 So.2d 971. The testimony of a victim may present sufficient evidence to establish that the victim sustained serious bodily injury, without the testimony of any expert. State v. Gunnells, 619 So.2d 192, 201 (La.App. 3rd Cir.), writ denied, 625 So.2d 1061 (La.1993). In this case, the jurors were charged with the law regarding simple battery, which does not require serious bodily injury. LSA-R.S. 14:35. They were advised that they could return that verdict if the evidence did not support conviction for a more serious grade of the offense. The jurors declined to find defendant guilty of the lesser offense of simple battery.
The record establishes that defendant purposely hit his wife repeatedly, throughout the day, causing her to have bruises, a black eye, and a gash on her head. He hit her in the head with the butt of a pistol numerous times, causing her brother to be concerned that she might have a concussion. Moreover, Elena testified that her whole body hurt for days after the incident. After a thorough review of the record, we are convinced that a rational trier of fact could conclude that the evidence, viewed in the light most favorable to the state, and with the credibility determinations made by the trier of fact, proved beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, all the elements of the crime of second degree battery and defendant's identity as the perpetrator of the offense. Specifically, we believe that the evidence was sufficient to enable the jurors to reasonably conclude that defendant intended to seriously injure Elena and that he did so. Compare State v. Helou, 02-2302 (La.10/23/03), 857 So.2d 1024, 1028-1029, and cases cited therein.
Furthermore, defendant was charged in this case with aggravated battery. Absent a contemporaneous objection to the giving of instructions on a responsive verdict, a defendant cannot complain if the jury returns a legislatively approved responsive verdict, even where there is insufficient evidence to support such a verdict, provided that the evidence is sufficient to support the charged offense. State v. Schrader, 518 So.2d 1024, 1034 (La.1988); State ex rel. Elaire v. Blackburn, 424 So.2d 246, 252 (La.1982), cert. denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983). In such a case, a jury has the right to "compromise" between the charged offense and a verdict of not guilty. State v. Charles, 00-1611 (La.App. 3rd Cir.5/9/01), 787 So.2d 516, 519, writ denied, 01-1554 (La.4/19/02), 813 So.2d 420. Jurors may return a "compromise" verdict for whatever reason they deem to be fair, so long as the evidence is sufficient to sustain a conviction for the charged offense. Blackburn, 424 So.2d at 251.
In the instant case, the trial court charged the jury regarding second *589 degree battery without a timely defense objection. Second degree battery is a legislatively approved responsive verdict to a charge of aggravated battery. LSA-C.Cr.P. art. 814(A)(14). Accordingly, if the evidence was sufficient to support a conviction for the charged offense, defendant has no basis for complaint. Thus, it is appropriate for us to review the sufficiency of the evidence to support a conviction for aggravated battery. Aggravated battery is a battery committed with a dangerous weapon. LSA-R.S. 14:34. A "dangerous weapon" includes any gas, liquid, or other substance or instrumentality, which, in the manner used, is calculated or likely to produce death or great bodily harm. LSA-R.S. 14:2(3). The dangerousness of an instrumentality because of its use is a factual question for the jury to decide for purposes of a conviction of aggravated battery. State v. Rainey, 98-436 (La.App. 5th Cir.11/25/98), 722 So.2d 1097, 1102, writ denied, 98-3219 (La.5/7/99), 741 So.2d 28. Aggravated battery requires neither the infliction of serious bodily harm nor the intent to inflict serious injury. Instead, the requisite intent element is general criminal intent. State v. Brown, 00-1951 (La.App. 1st Cir.5/11/01), 808 So.2d 622, 623-624.
In this case, the undisputed testimony was that defendant repeatedly hit Elena in the head with the butt of a pistol, causing a cut on her head and putting her in danger of sustaining a concussion. We are satisfied that the evidence presented, viewed in the light most favorable to the state, proved beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence, all of the elements of aggravated battery and the defendant's identity as the perpetrator of that offense. Thus, for the additional reason that there was sufficient evidence to convict defendant of the originally charged offense of aggravated battery, the jury's verdict of guilty of the responsive offense of second degree battery in this case does not entitle defendant to a reversal of his conviction.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER TWO
In this assignment of error, defendant claims the trial judge erred in not questioning prospective jurors about whether they had seen the defendant in prison garb prior to voir dire, in denying a mistrial, and in not ordering the removal of the defendant's prison armband.
Prior to the commencement of trial, defendant's motions for speedy trial and to quash for the state's alleged failure to prosecute timely came on for hearing. Defense counsel asked that defendant be unshackled and the trial court agreed. Defense counsel then asked that defendant's armband be removed and the following colloquy ensued:
Mr. Farmer: We need to take this off, too, Judge.
Court: Why?
Mr. Farmer: Well, it's (sic) got DOC number, Odom. I think it's obviously would be an indication he's a prisoner, which is probably going to address shortly.
Court: Well, for right now we don't need to take that off. I mean, if we get around to it and I think it's necessary, I'll deal with it. From here it looks like a hospital band and I don't think, unless we got some real eagle eye people sitting in the jury box over there, I don't think they're going to have any clue as to what that's all about. So have a seat. Let's get going.
*590 Defense counsel made no further comment, apparently acquiescing in the approach suggested by the trial judge. While there is nothing in the record to clearly indicate the size of the "armband," the comments made by the trial judge suggest that it might be more aptly characterized as a "wristband," similar to those used in a hospital. Defendant has made no showing that the identification device was noticeable or that defendant was prejudiced in any way by the failure of the trial judge to order its removal on the first day of trial. Thus, we have no basis to conclude that the trial judge committed error.
At the conclusion of the hearing on defendant's motions, counsel made a further motion to strike the jury panel on the ground that defendant was brought to court that morning through the front door of the courthouse, still dressed in prison clothes, and was led through the halls into the restroom area in such a manner that members of the jury panel likely saw him dressed in orange prison garb with his hands and feet shackled. The trial judge indicated that he would allow counsel to voir dire the prospective jurors on whether they recognized the defendant. If any prospective juror answered in the affirmative, he would further allow a sequestered voir dire of that prospective juror to determine if he or she recognized the defendant from seeing him in the court that day. Finally the trial judge indicated that if he could not find a set of qualified jurors who had not seen defendant in shackles, he would entertain the defense motion. Defense counsel insisted that he was entitled to have the panel stricken because defendant had asked to be dressed in civilian clothes prior to coming to court.
Voir dire proceeded as outlined above. The trial judge called a panel of twelve. He asked the panel as a whole if anyone knew the defendant. Later the trial judge asked if any of the prospective jurors had seen the defendant that morning in court. Each separate row of jurors was called upon to consider the question. The court reporter recorded the name of each prospective juror as the rows were called upon to say whether they had seen defendant in the courtroom that morning. The transcript reflects the notation, "No response," indicating that none of the prospective jurors had seen the defendant. Defense counsel followed up with the question:
Mr. Farmer: So the first time that you saw him was when you came in and sat down in these particular places a little while ago; is that correct?
Jury Panel One: (Some jurors respond in the negative. Some jurors have no response.)
No further questioning was conducted on this subject and the following voir dire questions dealt with domestic abuse. Taken in context, we believe the transcript indicates that none of the jurors had seen the defendant that morning. We reach this conclusion because defense counsel did not follow up with any further questions, even though the trial judge had agreed to conduct a sequestered voir dire if necessary. Furthermore, defense counsel did not renew his motion to strike the jury panel or move for a mistrial. A jury was seated without defense counsel exhausting his peremptory challenges. Moreover, after the jurors were selected, the trial judge cautioned his custodians to make sure that defendant was dressed in civilian clothes before he arrived for trial the next day. When the trial judge indicated that they had "dodged the bullet," defense counsel commented that it was amazing to him that there were eighteen people, referring to the potential jurors, and that *591 none of them saw the defendant that morning.
Since there is no showing that any of the prospective jurors saw the defendant in prison garb, we cannot conclude that the trial judge erred in refusing to dismiss the jury panel. There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER THREE
Defendant contends the trial judge erred in allowing state witness Deputy Chris Hickman to express an opinion concerning the progression of visible evidence of bruising with respect to his own "black eye." During presentation of the state's case, the prosecutor asked:
Q. Now, Deputy, have you ever had any experience either with yourself or somebody else about how bruises progress?
At this point defense counsel objected to the testimony on the ground that the witness was not qualified to testify as an expert. The trial judge responded as follows:
Let's hear what he has to say and then we can determine the extent of any training he may have had and make some type of call on it at that point. Go ahead. You can answer the question.
In keeping with the court's ruling, Deputy Hickman was asked again if he had ever seen how bruises progress over a few days time. He answered that he had not. The Deputy did not offer any lay or expert opinion testimony concerning the progressive appearance of bruises. Thus, any objection to opinion evidence offered by Deputy Hickman was cured by the answer given by the witness.
The prosecutor next asked if Deputy Hickman had ever had a black eye himself. Defense counsel did not urge an objection to this question. Deputy Hickman responded in the affirmative. When asked what it looked like on the first day, he described it as "black." Then he added that it turned green and yellow later on. No objections were made during this exchange and the questioning continued without further reference to any expertise of the Deputy. At no point did defense counsel renew his objection, ask that any testimony of the witness be stricken, or request that the jury be admonished relative to the Deputy's testimony.
Louisiana Code of Criminal Procedure article 841 provides that an irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. See also LSA-C.E. art. 103(A)(1). The purpose behind this rule is to make sure that the trial judge is apprised of the claim and given an opportunity to correct the alleged error. State v. Eames, 97-0767 (La.App. 1st Cir.5/15/98), 714 So.2d 210, 216, writ denied, 98-1640 (La.11/6/98), 726 So.2d 922. An error cannot be availed of on appeal if the defendant has not made known to the trial court the action which he wishes the court to take. State v. Williams, 341 So.2d 370, 378 (La.1976). Although defendant now complains on appeal that the testimony was irrelevant, prejudicial, and intended to inflame the jury, defendant did not state such grounds for his objection at trial. A defendant cannot raise on appeal grounds for an objection not made known to the trial judge. See State v. Green, 390 So.2d 1253, 1258 (La.1980). Thus, defendant is precluded from raising this issue on appeal.
This assignment of error has no merit.

ASSIGNMENT OF ERROR NUMBER FOUR
Defendant argues that the trial judge erred in allowing the prosecutor to *592 lead the victim during her direct testimony concerning her physical injuries. The prosecutor asked Elena if photographs taken at the police station depicted how she looked the night of the incident. She replied in the affirmative. The prosecutor then asked if her injuries "looked worse in the next few days." Defense counsel objected that this was a leading question because it suggested an answer. The trial judge disagreed and overruled the objection, indicating his view that the witness could answer the question any way she wanted to answer. Nevertheless, before the witness answered the original question, the prosecutor rephrased the question and asked:
Q. Ms. Odom, what did the injuries look like the next few days after this? The witness then responded, describing the progression of her injuries, without further objection.
Generally, a leading question should not be used in the examination of a witness. LSA-C.E. art. 611(C). A leading question is one that suggests the answer the witness is expected to give. State v. Lynch, 94-0543 (La.App. 1st Cir.5/5/95), 655 So.2d 470, 476, writ denied, 95-1441 (La.11/13/95), 662 So.2d 466. The use of leading questions is largely within the discretion of the trial judge, and only a clear abuse of discretion which prejudices the defendant's rights will justify reversal of a conviction. Lynch, 655 So.2d at 476. In our view, the trial judge did not abuse his discretion in overruling the objection to the question first posed by the prosecutor. Moreover, any objection to the question posed was cured when the prosecutor rephrased the question.
There is no merit to this assignment of error.

ASSIGNMENT OF ERROR NUMBER FIVE
Defendant complains in this assignment of error that the sentence imposed upon him is unconstitutionally excessive. However, the record reflects that neither an oral nor written motion to reconsider sentence was made by trial counsel. Under LSA-C.Cr.P. arts. 881.1(E) and 881.2(A)(1), the failure to make or file a motion to reconsider sentence shall preclude the defendant from raising an objection to the sentence on appeal, including a claim of excessiveness. State v. Felder, 00-2887 (La.App. 1st Cir.9/28/01), 809 So.2d 360, 369, writ denied, 01-3027 (La.10/25/02), 827 So.2d 1173; State v. Duncan, 94-1563 (La.App. 1st Cir.12/15/95), 667 So.2d 1141, 1143 (en banc per curiam). Accordingly, defendant is procedurally barred from having this assignment of error reviewed. Moreover, as noted below, we have identified a patent sentencing error that requires us to vacate defendant's sentence and remand for resentencing. Defendant will have an opportunity to challenge the excessiveness of his sentence when he is resentenced, if he deems it appropriate to do so.

ASSIGNMENT OF ERROR NUMBER SIX
Defendant points out that, although the jury found him guilty of second degree battery, his criminal commitment incorrectly reflects that he was found guilty and sentenced for the crime of aggravated battery. We agree that defendant's criminal commitment is inaccurate. However, for the reasons that follow, we are vacating defendant's sentence and remanding for resentencing as a consequence of a patent sentencing error discovered on appeal. The trial court should reissue a corrected criminal commitment when defendant is resentenced.

*593 PRO SE ASSIGNMENT OF ERROR

In this pro se assignment of error, defendant claims the trial judge erred in denying the motion to quash that he filed, asserting deprivation of his constitutional right to a fair trial. Defendant also filed a motion for speedy trial in June 2001, which was denied by the trial judge at the same time he disposed of the motion to quash. During the hearing on defendant's motions, the trial judge entertained argument as to defendant's statutory and constitutional rights to a speedy trial.
Louisiana Code of Criminal Procedure article 701, which provides the statutory right to a speedy trial, merely authorizes pre-trial relief. The remedy for a speedy trial violation under Article 701 is limited to release from incarceration without bail or release of the bail obligation for one not incarcerated. Once a defendant has been tried and convicted, any allegation of a violation is moot. State v. Cowger, 581 So.2d 283, 286 (La.App. 5th Cir.1991). Therefore, the trial court properly denied defendant's motions insofar as they were based upon a violation of Article 701.
In addition to the limitations provided for by Article 701, LSA-C.Cr.P. art. 578(2) provides for a two-year time limitation within which the trial of a defendant accused of a non-capital felony must be commenced. Defendant was charged on July 17, 2001, with an aggravated battery committed on June 2, 2001. Defendant's trial was commenced on February 3, 2003, well within the two-year time period allowed. Thus, to the extent that defendant's motions were based on Article 578(2), they were properly denied by the trial court.
Besides these statutory provisions, a defendant has the right to a speedy trial under the Sixth Amendment to the United States Constitution and LSA-Const. art. I, § 16. State v. Sullivan, 97-1037 (La.App. 4th Cir.2/24/99), 729 So.2d 1101, 1109, writ denied, 99-0797 (La.9/17/99), 747 So.2d 1093. The right to a speedy trial attaches when an individual becomes an accused, whether by formal indictment or bill of information or by arrest and actual restraint. State v. Dewey, 408 So.2d 1255, 1257 (La.1982). In Barker v. Wingo, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the Supreme Court set out the following four factors to determine whether a defendant's right to a speedy trial has been violated: (1) the length of the delay; (2) the reasons for the delay; (3) the defendant's assertion of his right to a speedy trial; and (4) the prejudice to the defendant. The court held that the length of the delay is the triggering mechanism; and, until the delay is presumptively prejudicial, there is no need to inquire into the other factors. In the instant case, defendant's trial commenced approximately nineteen months after his arrest. For purposes of considering defendant's pro se assignment of error, we will assume, without so deciding, that the delay was sufficiently prejudicial to trigger further inquiry.[3]
Retained counsel, Barry Bolton, filed a motion for speedy trial on June 29, 2001.[4] The motion was filed even before defendant was charged and there is no evidence that it was persistently urged. On the *594 same date, defense counsel filed motions for a bill of particulars, for a preliminary examination, and to suppress evidence. On August 20, 2001, another attorney, Marion Farmer, enrolled as counsel of record. This attorney, who served as trial counsel, also filed numerous pre-trial motions. There is no indication in the record that defendant took any action to move these motions toward resolution. The first trial setting, just six months after the charged offense, was continued at the request of defendant on December 4, 2001. Thereafter, the trial judge originally assigned to this matter recused himself on March 19, 2002, on grounds of conflict of interest because he was a complainant in proceedings filed against defense counsel, Barry Bolton. The minutes reflect that a pre-trial conference before the new judge assigned to handle the matter was scheduled for May 21, 2002, but the conference and trial were continued at the request of the defendant. Thereafter, on October 21, 2002, defendant's pre-trial motions were again continued, without notation in the record of the reason for the continuance. The minutes do not reflect that defendant objected to the delay. The defense motions were reset for hearing on October 28, 2002. There is no evidence in the record as to what occurred on that date. The minutes for January 17, 2003, indicate that defendant's pre-trial motions and the scheduled pre-trial conference were deferred until the trial week of February 3, 2003, again without any indication of objection by defendant.
Defendant's motion to quash based on denial of his right to a speedy trial was filed in open court on the morning of trial, February 3, 2003. At the hearing on defendant's motions, defense counsel conceded that the first trial setting was continued at his request in December 2001. The state represented that the next trial setting in May 2002, was also continued at the request of defendant, as shown in the minutes. Defense counsel disagreed, advising that he did not recall asking for that or any other continuances. Defendant, however, made no claim at the hearing, and has made no claim on appeal, that the state was guilty of any bad faith or dilatory tactics, nor has defendant demonstrated any prejudice from the complained of delay.
It appears that although defendant remained incarcerated, he was already serving time on other charges. Although defendant may have suffered some anxiety and concern, he does not even mention that factor in his brief on appeal. Moreover, although there were instances where witnesses indicated their lack of recollection of specific details, none of those details were relevant to the essential elements of the offense charged. The victim testified in no uncertain terms that the defendant intentionally beat her with the butt of a pistol and with his fists and feet. We cannot conclude that there was any impairment of defendant's ability to prepare his defense.
After carefully considering the record in this matter and the balancing test set forth in Barker v. Wingo, together with other relevant circumstances peculiar to this case, we are satisfied that the trial judge did not err in denying defendant's motions. See State v. Cyrex, 97-2520 (La.App. 1st Cir.9/25/98), 746 So.2d 1, 5-7, writ denied, 98-2692 (La.1/29/99), 736 So.2d 829.
There is no merit to this assignment of error.

PATENT ERROR
In reviewing the record for patent error, we have discovered that the trial court did not wait the required twenty-four hours after denial of defendant's motion in arrest of judgment before imposing *595 sentence, nor did defendant waive the waiting period. LSA-C.Cr.P. art. 873. For that reason, we are required to vacate defendant's sentence. In State v. Augustine, the Louisiana Supreme Court held that a trial court's failure to observe the 24-hour delay is not harmless error if the defendant challenges his sentence on appeal, regardless of whether the defendant demonstrates that he was prejudiced by the failure to observe the delay period. State v. Augustine, 555 So.2d 1331, 1333-1334 (La.1990). See also State v. Claxton, 603 So.2d 247, 250 (La.App. 1st Cir.1992). Although we are procedurally barred from considering defendant's challenge, he has challenged his sentence on appeal. Thus, according to the Louisiana Supreme Court, the error is not harmless, and we must vacate the sentence.
CONVICTION AFFIRMED; SENTENCE VACATED; REMANDED FOR RESENTENCING.
NOTES
[1] The state filed a bill to establish habitual offender status and defendant pled not guilty. The record does not contain evidence of a habitual offender adjudication or sentencing.
[2] No objection or request for an admonition was made regarding references to defendant's prior incarceration.
[3] Compare State v. Brock, 99-2128 (La.App. 4th Cir.6/14/00), 767 So.2d 130, 131, writ denied, 00-2147 (La.9/28/01), 797 So.2d 684.
[4] The motion, filed before defendant was charged, does not contain the required verification that counsel is ready for trial. LSA-C.Cr.P. art. 701(D)(1). Other pre-trial motions filed on the same date undermine any claim that defendant was prepared for trial at that time. Compare State v. Green, 01-3358 (La.2/1/02), 808 So.2d 318, 321-322 (per curiam).