CRAIN, J.
|?The defendant, John Cobb, was charged by grand jury indictment with three counts of theft of over $500, violations of Louisiana Revised Statute 14:67(B)(1).[1] He pled not guilty and, following a jury trial, was found guilty on all counts. On each count, the trial court imposed a suspended sentence of five years imprisonment at hard labor, and placed the defendant on supervised probation for a period of five years, which time was ordered to run concurrent. A $1,000 fine was imposed on each count, with the fines ordered to run consecutive. On count one, the defendant was additionally sentenced to perform 180 days of public service and to make restitution to a maximum indemnity of $15,000. Finally the defendant was ordered to pay court costs as to each count. The defendant now appeals, arguing the insufficiency of the evidence to convict and ineffective assistance of counsel. We affirm the convictions and sentences imposed on counts one and two. We reverse the conviction and sentence imposed on count three.
FACTS
In 2006, the members of Union Bethel Family Church,[2] located in West Feliciana Parish, undertook construction of a new sanctuary. The church could not afford to hire a contractor; therefore, the members determined they would perform much of the work themselves. The church members agreed to designate the defendant, who was both a church member and a member of the church’s Board of Directors, as the church’s “subcontractor.” A document memorializing that agreement was signed by the church’s pastor, a representative of the Board of Directors, and the church’s Deacon Chairman, which specified that the defendant’s services were to be rendered at no cost to the church. The defendant was solely in | ^charge of the construction project.
In 2009, a church member was notified that the church’s bank account was overdrawn. After receiving copies of checks drawn on the church’s account, the church *21 member became convinced that the church’s finances were not being handled appropriately and notified law enforcement. Sergeant Lance Kennedy with the Louisiana State Police began investigating the matter. During the course of his investigation, Sergeant Kennedy subpoenaed records, interviewed witnesses, including the defendant, and discerned that the defendant entered into the following schemes to enrich himself:

$80,000.00 Donation

In December of 2008, a check in the amount of $80,000 was issued to the church by Feliciana’s Enrichment Center, Inc. The defendant presented the check to Highlands Bank in St. Francisville, and received a cashier’s check in the amount of $15,000 payable to E.C. Construction, and a cashier’s check in the amount of $65,000 payable to the church. The $15,000 cashier’s check was endorsed by both “E.C. Construction” and “J.C. Construction,” with $13,000 deposited into the defendant’s personal bank account and $1,265.30 used to make a payment on a loan owed by the defendant. The $65,000 cashier’s check was deposited into the church’s account at Bank of St. Francisville. At the same time, two checks, each in the amount of $25,000, were drawn on the church’s account. The first was payable to John B. Perry and included the notation “Contra[c]tor Services” and the second was payable to David Deloach and included the notation “Sub-Contra[c]tor.” Checks drawn on the bank’s account required two authorized signatures. Both of the $25,000 checks were signed by authorized signatories Carol Cobb (the defendant’s wife who was also the church’s secretary) and Louisa Jones (Carol Cobb’s mother who was also the church’s under-secretary).
|4The investigation revealed that the above described transactions were a scheme to pass insurance money received by the Enrichment Center through the church and into the hands of the Enrichment Center’s president, Oliver Wingfield, and vice-president, George Veal. Of the $80,000 donated by the Enrichment Center to the church, the church ultimately kept $15,000, Wingfield received approximately $23,500 from Deloach, and Veal received money from Perry.[3] The balance of the donation, represented by the $15,000 cashier’s check payable to E.C. Construction, was negotiated by the defendant, with a portion deposited into his personal account and a portion used to make a personal loan payment.

Payment for Steeple Construction

The church issued a check dated May 27, 2009, to the defendant in the amount of $5,120.83 with the notation “Steeple (Mtrl & Labor).” The check was signed by Carol Cobb and Louisa Jones. On May 28, 2009, the defendant presented that check to Bank of St. Francisville, received $1,570.83 in cash, and deposited the $3,550 balance into his personal checking account. Sergeant Kennedy’s investigation revealed that the defendant paid laborers only $4,000 to build the church’s steeple in early 2010.

Payments to Jerome Gray

During the course of the construction project, the church began paying some individuals for their labor. Checks were issued to Jerome Gray for his work at the church, which Gray asked the defendant to cash. The investigation revealed eleven checks payable to Gray. Four of those checks bear the names of both Gray and the defendant as endorsers. During the *22 investigation, Gray denied signing those checks or receiving the money payable by them. The total amount of those checks | r,exceeded $500.
The defendant maintains that he did not misappropriate any church funds. On appeal the defendant argues that the evidence was insufficient to support the three convictions and that his trial counsel was so ineffective as to undermine confidence in the jury’s verdicts.
SUFFICIENCY OF THE EVIDENCE
A conviction based on insufficient evidence cannot stand as it violates Due Process. See U.S. Const, amend. XIV; La. Const, art. I, § 2. The standard of review for the sufficiency of the evidence to uphold a conviction is whether or not, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979). See La.Code Crim. Pro. art. 821(B); State v. Ordodi, 06-0207 (La.11/29/06), 946 So.2d 654, 660; State v. Mussall, 523 So.2d 1305, 1308-09 (La. 1988). The Jackson standard of review, incorporated in Article 821, is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, Louisiana Revised Statute 15:438 provides that the factfinder must be satisfied the overall evidence excludes every reasonable hypothesis of innocence. See State v. Patomo, 01-2585 (La.App. 1 Cir. 6/21/02), 822 So.2d 141,144.
Louisiana Revised Statute 14:67A provides:[4]
Theft is the misappropriation or taking of anything of value which belongs to another, either without the consent of the other to the misappropriation or taking, or by means of fraudulent conduct, practices, or representations. An intent to deprive the other permanently of whatever may be the subject of the misappropriation or taking is essential.
To support a conviction of theft, the State must prove that the defendant | ^misappropriated or took a thing of value that belonged to another, without the consent of the owner, with the intent to permanently deprive the owner of that which was misappropriated or taken. State v. Richey, 13-228 (La.App. 5 Cir. 10/30/13), 128 So.3d 1143,1150. The State must also prove the value of the stolen thing because the thing’s value is determinative of both the severity of the offense and the degree of punishment upon conviction. State v. Ramsdell, 06-644 (La.App. 5 Cir. 12/27/06), 949 So.2d 508, 511; see also La. R.S. 14:67B. Here, the defendant was charged and convicted of three counts of theft of over $500.

Counts 1 and 2

($80,000 Donation and Payment for Steeple Construction)

It was established at trial that Feli-ciana’s Enrichment Center agreed to donate $80,000 to the church from fire insurance proceeds. The Enrichment Center’s president, Wingfield, vice-president, Veal, and the defendant agreed that the Enrichment Center would donate $80,000 to the church, with the understanding that $50,000 would be returned to Wingfield and Veal. The defendant characterized the $50,000 as money that was “donated back.” The defendant presented the $80,000 dona *23 tion check payable to the church to the bank in exchange for a $65,000 cashier’s check payable to the church and a $15,000 cashier’s check payable to E.C. Construction.
The defendant deposited ■ the ' $65,000 cashier’s check into the church’s account, which covered two checks drawn on the church’s account in the amounts of $25,000, payable to Perry and Deloach, respectively. Upon receipt, Perry and Deloach forwarded money to Wingfield and Veal, accomplishing the “donation back.” After the investigation of the defendant commenced, Wingfield, Veal, and the defendant met and agreed that they would tell the police that Deloach was paid as a consultant. At trial Wingfield read a portion of his transcribed interview with police, in which he stated that his son-in-law, Deloach, had not done any consulting 17work. Deloach also testified that he had never done any work for the church.
The $15,000 cashier’s check made out to “E.C. Construction” was ostensibly for Earl Comena, a carpenter who worked on the construction project. Comena testified that he “was just going to donate some help, but they still gave me something,” though it was not “a whole lot.” Comena explained that the defendant primarily paid him in cash, but in one situation, the defendant called him from the bank and Comena authorized the defendant to endorse a check for him and bring him cash. Comena stated he only authorized the defendant to endorse the one check, and was sure it was for an amount less than $2,500. However, Comena admitted that he may have authorized the defendant to endorse the $15,000 check.
The $15,000 cashier’s check was endorsed with both “E.C. Construction” and “J.C. Construction.” The defendant has no construction company and is neither a licensed nor bonded contractor. Of the $15,000, $13,000 was deposited into the defendant’s bank account, and $1,265.30 was used to make a monthly payment the defendant owed on a loan -with Feliciana Federal Credit Union. The defendant testified that he deposited the $15,000 cashier’s check into his personal account and used it “as [he] saw fit to advance the church.” The defendant testified that Comena was paid for his work, but not out of the $15,000 cashier’s check.
As to the payment for the steeple construction, the State introduced into evidence a check in the amount of $5,120.83, payable to the defendant, and drawn on the church’s account. The reference line includes the notation “Steeple (Mtrl & Labor).” The defendant deposited that check into his bank account on May 28, 2009, and received $1,570.83 in cash. David Hall, Sr., testified that he and his son constructed the church’s new steeple in January or February of 2010, and were paid as work was completed. An affidavit dated May 14, 2010, with Hall as the purported affi-ant, was introduced into evidence at trial, which stated that Hall |sreceived $5,000 to build the steeple and was paid in May and June of 2009 for the work. It further stated that construction was delayed because of problems with the church. However, Hall testified that, while his signature was on the affidavit, he had never seen the affidavit and did not sign it. Rather, Hall recollected receiving cash payments in early 2010 that totaled approximately $4,000.
The defendant contends that the church’s Board of Directors appointed him as contractor for construction of a new church and that bank representatives who testified did not indicate that he conducted any unauthorized or illegal transactions. He contends that the State failed to prove lack of consent or fraud with regard to *24 each of the three counts. Regarding the $80,000 donation, the defendant argues:
[The defendant] did not promise the church it would get all of the $80,000. He told the church they were going to have to basically serve as a conduit for most of that, and the church agreed. There was no fraud against the church. It may have been an unusual scheme, and it may have contravened IRS regulations. But it was not theft.
Regarding the payment for the steeple, the defendant contends that he paid to have the steeple built and it was built.
The jury, having heard the testimony and viewed the evidence, and notwithstanding any inconsistencies, found the defendant guilty on these counts. The trier of fact is free to accept or reject, in whole or in part, the testimony of any witness. Moreover, when there is conflicting testimony about factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. The trier of fact’s determination of the weight to be given evidence is not subject to appellate review. An appellate court will not reweigh the evidence to overturn a factfin-der’s determination of guilt. State v. Taylor, 97-2261 (La.App. 1 Cir. 9/25/98), 721 So.2d 929, 932. We are constitutionally precluded from acting as a “thirteenth juror” in assessing what weight to give evidence in criminal cases. | qState v. Mitchell, 99-3342 (La.10/17/00), 772 So.2d 78, 83. The fact that the record contains evidence that conflicts with the testimony accepted by a trier of fact does not render the evidence accepted by the trier of fact insufficient. State v. Quinn, 479 So.2d 592, 596 (La.App. 1 Cir.1985).
When a case involves circumstantial evidence and the jury reasonably rejects the hypothesis of innocence presented by the defendant’s own testimony, that hypothesis falls, and the defendant is guilty unless there is another hypothesis which raises a reasonable doubt. State v. Captville, 448 So.2d 676, 680 (La.1984). The defendant maintains that there was no theft because the church approved his actions and the steeple was built. In finding the defendant guilty, the jury apparently rejected the defense’s theories of innocence.
Regardless of whether some portion of the $15,000 check that was deposited into the defendant’s account was used to pay Comena or to make authorized payments, it is undisputed that $1,265.30 of that money was used by the defendant to make a personal loan payment. The taking of $1,265.30 alone, which was clearly designated for the church, was enough to satisfy the elements of theft over $500 as to count one. Further, accepting Hall’s testimony as true, only $4,000 was used to construct the steeple. The jury could have reasonably concluded that the defendant took or misappropriated the balance of the church funds designated for payment of the new steeple. This evidence was sufficient to satisfy the elements of theft of over $500 as to count two. The guilty verdicts reflect the reasonable conclusion that the defendant misappropriated church funds by means of fraudulent conduct and, in using that money for his personal benefit, permanently deprived the church of its money, and further that the defendant enriched himself with church money while at the same time having the steeple built.
After a thorough review of the record, we find that the evidence supports the | miur/s verdicts. We are convinced that viewing the evidence in the light most favorable to the State, any rational trier of fact could have found beyond a reasonable doubt, and to the exclusion of every reasonable hypothesis of innocence, that the *25 defendant was guilty of these counts of theft of over $500.

Count 3

(Payments to Jerome Gray)

As to the payments to Jerome Gray, the State introduced into evidence multiple cheeks drawn on the church’s account payable to Jerome Gray, who worked as a laborer on the construction project. The checks were endorsed with the names of both Jerome Gray and the defendant. Gray testified that he had the defendant cash his checks and that he always received his money. Gray denied that there were any cheeks that the defendant cashed but did not give him the money. The State then questioned Gray about his taped interview with police in which Gray stated that he did not receive money for some checks that the defendant endorsed. Gray then recanted the prior statement and testified that he had been threatened and made to make the statement. Noting that Gray’s trial testimony directly contradicted his prior statement to police, the State offered and the trial court accepted into evidence the audiotape of Gray’s interview with police. The audio-taped interview was played for the jury.
During the audiotaped interview, Gray reviewed checks drawn on the church’s account that were payable to him and endorsed with both his name and the defendant’s. Gray denied receiving funds for four checks and marked copies of those checks with his initials. After the interview was played for the jury, the State introduced into evidence the initialed copies of those checks. The State then questioned Gray about that evidence. Gray identified his initials and explained that he marked the checks with his initials because his signature is not on the checks, but stated that he had given the defendant permission to sign his name. He further Intestified that he received all of the money, which he may have forgotten at the time of his interview. The State concluded its questioning by asking Gray, “You didn’t get some of the money that were [sic] reflected on these checks, right?” To which Gray answered, “I can’t remember.”
In response to questioning by defense counsel Gray, further explained that he was paid for his labor by check, and sometimes the defendant gave him cash from the defendant’s pocket since he had no way to cash his checks. Gray testified that he was unable to cash his checks, so when he received them he asked the defendant to cash them. Gray testified that at all times, he authorized the defendant to cash his checks and that the defendant paid him for the work he did on the church. Gray further testified that he was paid for all of the checks that the defendant signed with Gray’s name, pursuant to Gray’s authority. Gray denied that the defendant stole any money from him from checks received from the church.
Gray’s statement to police that he did not receive money for four checks, the total of which exceeded $500, which the defendant endorsed with Gray’s name and the defendant’s name, is the sole evidence presented by the State as to count three to establish that the defendant violated Louisiana Revised Statute 14:67A. Thus, the State relied on the prior inconsistent out-of-court statement by Gray to prove the truth of the matter asserted — that the defendant cashed the checks payable to Gray and took the money, which totaled more than $500.
Hearsay is a statement, other than one made by the declarant while testifying, offered into evidence to prove the truth of the matter asserted. La.Code Evid. art. 801C. Gray’s prior audiotaped interview meets this definition. While a witness’s prior inconsistent statement can be used to *26 attack the credibility of that witness, until the 2004 amendment to Louisiana Code of Evidence article 801D, it could not be used as substantive evidence of a defendant’s guilt. See La.Code 112Evid. art. 607D(2); State v. Cousin, 96-2973 (La.4/14/98), 710 So.2d 1065, 1069; State v. Allien, 366 So.2d 1308, 1311 (La.1978); State v. Ray, 259 La. 105, 249 So.2d 540, 542 (La.1971).
Article 801D now provides:
D. Statements which are not hearsay. A statement is not hearsay if:
(1) Prior statement by witness. The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is:
(a) In a criminal case, inconsistent with his testimony, provided that the proponent has first fairly directed the witness’ attention to the statement and the witness has been given the opportunity to admit the fact and where there exists any additional evidence to corroborate the matter asserted by the prior inconsistent statement [ ]
[Emphasis added.] Thus, Article 801D(l)(a) now provides that a prior inconsistent statement is not hearsay and can be considered for the truth of the matter asserted, if the statement is corroborated. State v. Harper, 07-0299 (La.App. 1 Cir. 9/5/07), 970 So.2d 592, 601, writ denied, 07-1921 (La.2/15/08), 976 So.2d 173.
The State presented no evidence to corroborate Gray’s audiotaped interview in which he stated that he did not receive money payable to him by checks drawn on the church’s account that were cashed by the defendant. Although the checks endorsed with the names of Gray and the defendant were introduced as evidence, those checks alone do not establish that the defendant took the amounts represented, without the consent of the owner, and with the intent to permanently deprive the owner of that which was taken, as required for a conviction of theft. See La. R.S. 14:67A. Without additional corroborating evidence, Gray’s prior inconsistent statement cannot be used as substantive evidence of the defendant’s guilt.
Defense counsel did not object to Gray’s audiotaped interview being introduced into evidence and played for the jury. Ordinarily, hearsay evidence that | isis not objected to constitutes substantive evidence and may be considered by the trier of fact to the extent of any probative or persuasive powers that it might have. Allien, 366 So.2d at 1311; State v. Harris, 444 So.2d 257, 262 (La.App. 1 Cir.1983), unit denied, 445 So.2d 1234 (La.1984). However, the Louisiana Supreme Court has recognized that uncorroborated hearsay evidence in the form of an out-of-court statement by a witness who later denies its truth, is not alone sufficient to sustain a criminal conviction. Allien, 366 So.2d at 1311; see also State v. Laprime, 437 So.2d 1124, 1128 (La.1983) (Lemmon, J., concurring).
Gray’s audiotaped interview with the police was made out of court, was not made under oath, and was denied by Gray at trial as being untruthful. In reviewing the sufficiency of the evidence to sustain the conviction on count three, we must consider that the statement is not non-hearsay under Article 801D(l)(a) and, without additional corroborating evidence, is insufficient evidence to support a conviction. Al-lien, 366 So.2d at 1311; see also State v. Jones, 48,624, 48,625 (La.App. 2 Cir. 1/22/14), 132 So.3d 505, 511. Because the audiotaped interview was the sole evidence of defendant’s guilt relative to count three, we reverse the defendant’s conviction and sentence for theft of over $500 on count three.
*27 INEFFECTIVE ASSISTANCE OF COUNSEL
In his second assignment of error, the defendant argues that his trial counsel was so ineffective as to undermine confidence in the jury’s guilty verdict.
A defendant is entitled to effective assistance of counsel under the Sixth Amend-, ment to the United States Constitution and Article I, Section 18 of the Louisiana Constitution. In assessing a claim of ineffectiveness, a two-pronged test is employed. The defendant must show that (1) his attorney’s performance was deficient, and (2) the deficiency prejudiced him, Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984). The error is | ^prejudicial if it was so serious as to deprive the defendant of a fair trial or “a trial whose result is reliable.” Strickland, 466 U.S. at 687, 104 S.Ct. at 2064. In order to show prejudice, the defendant must demonstrate that there is a reasonable probability that, but for counsel’s unprofessional errors, the result of the proceeding would have been different. Strickland, 466 U.S. at 694, 104 S.Ct. at 2068; State v. Thomas, 12-1410 (La.9/4/13), 124 So.3d 1049,1053.
A claim of ineffective assistance of counsel is more properly raised by an application for post-conviction relief in the district court where a full evidentiary hearing may be conducted, rather than on appeal. However, where the record discloses sufficient evidence to decide the issue of ineffective assistance of counsel when raised by assignment of error on appeal, it may be addressed in the interest of judicial economy. State v. Bishop, 10-1840 (LaApp. 1 Cir. 6/10/11), 68 So.3d 1197, 1207, writ denied, 11-1530 (La.12/16/11), 76 So.3d 1203.
The defendant contends that defense counsel’s assistance was deficient because defense counsel failed to urge a Batson objection, object to leading questions, object to hearsay, and introduce defense exhibits into evidence in a coherent manner. After reviewing the record before us and the arguments raised, we find that the only deficiencies alleged by the defendant that are subject to appellate review are that defense counsel should have objected to the State’s hearsay evidence and to leading questions.
The defendant contends that the testimony of the State’s most damaging witness, Sergeant Kennedy, was “full of accounts of what other people told him in the course of his investigation.” The defendant asserts that most of the testimony was hearsay and had defense counsel objected when the hearsay testimony began, instead of waiting twenty pages into the testimony, “the court would probably have | ^sustained the objection ... [a]nd [Sergeant] Kennedy wouldn’t have been able to put on the smooth show he did.”
The defendant does not identify any specific instances of hearsay to which defense counsel should have objected. However, after reviewing Sergeant Kennedy’s testimony, we find that any potentially objectionable hearsay was harmless beyond a reasonable doubt because it was cumulative and corroborative of other testimony and demonstrative evidence that established the defendant’s guilt. See La.Code Crim. Pro. art. 921; State v. Spell, 399 So.2d 551, 556 (La.1981). This argument is without merit.[5]
*28 The defendant additionally argues that defense counsel should have objected to leading questions directed to State’s witnesses. The defendant argues that the few objections to leading questions urged by defense counsel were almost invariably sustained, and had defense counsel objected every time they should have, “almost all of their objections would have been sustained, and the [State] would not have been able to make witnesses say what [it] wanted them to say.”
A leading question is one that suggests the answer the witness is expected to give, and, in general, should not be used on the direct examination of a witness. See La.Code Evid. art. 611C; State v. Odom, 03-1772 (La.App. 1 Cir. 4/2/04), 878 So.2d 582, 592, unit denied, 04-1105 (La.10/8/04), 883 So.2d 1026. “Generally, a leading question is forgiven if it is directed to relieve a confused or nervous witness, or to clarify or substantiate a witness’s prior response. A question is not leading if it merely directs the witness to the subject matter, or the identity of the evidence.” State v. Moore, 575 So.2d 928, 932 (La.App. 2 Cir.1991) (citing La.Code Evid. art. 611C). The use of leading questions is largely within the discretion [ 1Bof trial court and only a clear abuse of discretion that prejudices the defendant’s rights will justify reversal of a conviction. Odom, 878 So.2d at 592.
Many of the allegedly leading questions cited by the defendant do not suggest an answer and are therefore not leading questions. Other questions that the defendant claims that defense counsel should have objected to were clearly offered to clarify or substantiate the witness’s prior response. After reviewing all of the questions that the defendant contends are leading and that defense counsel should have objected to, we conclude that the defendant has not shown that defense counsel’s performance was deficient and that the deficiency was so serious as to deprive the defendant of a fair trial or a trial whose result is reliable. This argument is also without merit.
The record before us does not disclose sufficient evidence for us to evaluate the remaining ineffective assistance of counsel allegations, namely that defense counsel was ineffective based on the failure to make a Batson objection and to introduce vital evidence. The record is silent as to the race of the members of the jury venire and, since the defense did not make a Batson objection, there has been no pri-ma facie showing that the State exercised peremptory challenges on the basis of race, and the burden never shifted to the State to articulate race-neutral reasons for striking jurors.[6] This claim is more properly raised by application for postconviction relief where, if necessary, a full evi-dentiary hearing may be conducted by the district court.[7]
[ 17SimiIarly, with regard to the defendant’s claim that defense counsel was *29 ineffective for failing to introduce vital evidence, there is nothing in the record to indicate that there was documentary evidence other than what was introduced into evidence at trial. The claim is more properly raised by application for postconviction relief, where, if necessary, a full evi-dentiary hearing may be conducted.
Considering the foregoing, we find no merit to the defendant’s argument that defense counsel’s failure to object to hearsay testimony or to leading questions rendered his assistance so ineffective as to undermine confidence in the jury’s guilty verdict. Moreover, after considering the totality of the evidence before the jury, we do not find a reasonable probability exists that, absent the alleged errors of defense counsel, the jury would have had a reasonable doubt as to the defendant’s guilt. See State v. Hilton, 99-1239 (La.App. 1 Cir. 3/31/00), 764 So.2d 1027, 1036, writ denied, 00-0958 (La.3/9/01), 786 So.2d 113. The remainder of the defendant’s allegations cannot be reviewed on appeal.
CONCLUSION
For the foregoing reasons, the defendant’s convictions on counts of one and two of theft of over $500 are affirmed. The sentences imposed on counts one and two are also affirmed. The defendant’s conviction and sentence on count three of theft of over $500 are reversed.
CONVICTIONS AND SENTENCES ON COUNTS ONE AND TWO AFFIRMED; CONVICTION AND SENTENCE ON COUNT THREE REVERSED.

. All references to Section 14:67 are to the version in effect prior to its 2010 amendment unless otherwise noted.

. The church is also known as the "Church of Weyanoke.”

. Wingfield admitted that he entered "a plea of nolo contendré or guilty in connection with a scheme” between the Enrichment Center and the church. Deloach and Perry similarly testified that they pled guilty to charges related to the scheme.

. Part of A of Section 14:67 was unchanged by Louisiana Acts 2010, Number 585, Section.

. The defendant does not argue on appeal that defense counsel was ineffective for failing to object to the introduction of Gray’s audio-taped interview with the police, which we have determined is hearsay and inadmissible as evidence of guilt. Nevertheless, that issue is rendered moot by our reversal of his conviction on count three.

. In Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court adopted a three-step analysis for evaluating claims that the State’s use of peremptory challenges violated constitutional rights. First, the defendant must make a pri-ma facie showing that the State exercised peremptory challenges on the basis of race. Second, if the requisite showing is made, the burden shifts to the State to articulate a race-neutral explanation for striking the jurors in question. Third, the trial court must determine whether the defendant has carried his burden of proving purposeful discrimination. See Miller-El v. Cockrell, 537 U.S. 322, 328-29, 123 S.Ct. 1029, 1035, 154 L.Ed.2d 931 (2003).

. The defendant would have to satisfy the requirements of Louisiana Code of Criminal Procedure articles 924, et seq., in order to receive such a hearing.