655 So.2d 470 (1995)
STATE of Louisiana
v.
Clyde Aaron LYNCH.
No. 94 KA 0543.
Court of Appeal of Louisiana, First Circuit.
May 5, 1995.
*473 Lori L. Nunn, Baton Rouge, for State.
Walter C. Dumas, Baton Rouge, for defendant-appellant.
Before LOTTINGER, C.J., and SHORTESS and CARTER, JJ.
SHORTESS, Judge.
Clyde Aaron Lynch (defendant) and a codefendant, Raymond L. Austin, Jr., were charged by bill of information with two counts of armed robbery, LSA-R.S. 14:64. Lynch pled not guilty and, after trial by jury, was convicted as charged. The court sentenced him on each count to serve a term of fifty years imprisonment at hard labor, without benefit of parole, probation, or suspension of sentence and with credit for time served. The court ordered that the sentences be served concurrently. Defendant has appealed, urging thirteen assignments of error. Assignment number ten was not briefed on appeal and, therefore, is considered abandoned. See Uniform Rules Courts of Appeal, Rule 2-12.4. The case against Austin is not before us.

FACTS
On December 13, 1991, Richard and Susan Lipsey left their Baton Rouge home at about 7:00 p.m. About an hour after they left, Raymond Austin and defendant broke a bedroom window in the home and entered through the window. After the men entered the house, they searched the bedroom looking for items to steal. Defendant found a revolver in the nightstand, and Austin broke into Mrs. Lipsey's jewelry box. Austin put the jewelry he found into a binocular case he found in the closet. Austin then prepared to leave as he and defendant had planned. He warned defendant not to enter the hallway because of the alarm system and told defendant he would leave the binocular case by the fence. Austin then left the residence, leaving defendant in the bedroom.
Since 1989, Austin had been burglarizing homes in upscale neighborhoods without being caught. Because he dressed entirely in black and wore a mask, investigating officers referred to him as the "Ninja burglar." Austin considered himself to be only a burglar and avoided confrontations with the residents of the homes he burglarized. When he told *474 defendant about his plans to burglarize the Lipsey residence, defendant expressed an interest in breaking into a safe Austin saw when he checked out the house. Austin knew they could not open the safe, so they agreed Austin would break into the house and then he would leave defendant behind. Defendant stayed at the house, intending to make the residents open the safe when they returned.
The Lipseys returned at about 10:30 p.m. Mr. Lipsey went into the backyard to check on their dogs, and Mrs. Lipsey opened the back door with her key. Everything appeared normal to Mrs. Lipsey. After checking messages on the telephone answering machine, she walked to her bedroom. As she turned on the light to go into her bedroom, a man jumped out from behind her and grabbed her. The man hit her in the head with a gun and repeatedly threatened to kill her. While she was struggling with the man in a dark hallway, Mr. Lipsey entered and thought his wife was choking or having a heart attack. However, he quickly realized an intruder was in the house.
The man ordered the Lipseys into their bedroom, made Mr. Lipsey lie down, and forced Mrs. Lipsey to open the safe. The intruder repeatedly screamed threats and brandished the weapon throughout the altercation. In response to his demands, Mrs. Lipsey placed all of the cash, jewelry, and watches which were in the safe into a canvas bag he gave her. Mrs. Lipsey recognized the bag as being one her husband recently had purchased. When she finished putting the items into the bag, the intruder made her lie down next to her husband, then made the victims remove the jewelry they were wearing and empty their pockets. He then forced the Lipseys into their bathroom and made them lie down in the bathtub. Several times the intruder opened the bathroom door and warned them not to get up. When they heard their dogs barking, Mr. Lipsey cautiously left the bathroom and telephoned the police.
When the police arrived, Mr. Lipsey provided a detailed description of the intruder. He had anticipated being asked to describe the intruder and had tried to remember as many features as he could. At trial, he described the intruder as wearing dark blue or black clothing with long sleeves and long matching pants. The intruder wore a black mask which covered his hair, ears, and chin; but Mr. Lipsey could see the assailant's eyes, nose, and upper lip. During part of the robbery, including the time when the intruder removed Mr. Lipsey's bracelet, the intruder's mask was partially off his face, allowing Mr. Lipsey to see the assailant's face better. Mr. Lipsey described the eyes as being very large and penetrating and the nose as being rounded. He estimated the intruder's height at 5' 7" or 5' 8", weight to be 150 or 160 pounds, and age at early 20's. The intruder's complexion was very dark. He was muscular and in good physical shape. When asked to view defendant in court, Mr. Lipsey testified that it was difficult for him to identify the intruder but that he was ninety percent certain defendant was the person who had robbed him.
The Lipseys made a list of the items stolen from them. The intruder took approximately $2,000.00 in cash, jewelry and watches valued at about $400,000.00, and some guns. Much of the jewelry had belonged to the Lipseys' grandparents and great-grandparents.
During the initial investigation, officers located the binocular case by the fence. It still contained some of Mrs. Lipsey's jewelry which had been taken from her jewelry box. Eventually the investigation into this and other similar burglaries focused on Raymond Austin, and the police conducted a twenty-four hour surveillance of Austin's activities.
Austin finally was caught on February 11, 1992, after the police saw him park his car next to a residential area. Dressed in black, Austin walked into the neighborhood. He was stopped when he returned to his car. The police recognized a religious medallion Austin was wearing as having been stolen from Mr. Lipsey. When the police removed Austin's watch to put on the handcuffs, they saw it had Mr. Lipsey's name on it. The police also found jewelry belonging to the Lipseys in Austin's car. When Mr. Lipsey came to the station to identify the jewelry, he saw Austin and told the detective that Austin *475 (who was tall and light-complexioned) did not look like the man who had robbed him.
After the police arrested Austin, they executed a search warrant for the apartment he shared with defendant. Defendant was home when the warrant was executed. Beside defendant's bed, the officers found the canvas bag into which Mrs. Lipsey had put the jewelry. Some small pieces of jewelry belonging to the Lipseys still were in the bag. On a coffee table in the living room, the officers found a watch which defendant claimed to own. However, the serial number on the watch matched a watch owned by Mr. Lipsey. Defendant claimed Austin gave him the jewelry and watch. Numerous pieces of jewelry belonging to the Lipseys were found in Austin's bedroom. The police also searched defendant's car and found two guns belonging to Mr. Lipsey in the trunk.
Initially Austin denied participation in the robberies of the Lipseys. However, eventually he admitted his involvement in the break-in and detailed defendant's involvement. According to Austin, when he next saw defendant after the offenses, defendant had a bag with jewelry in it. Defendant told Austin he had forgotten to pick up the binocular case. Austin sold part of the jewelry to Ricky's Creative Jewelry Store for $12,000.00 and gave defendant $7,000.00. A couple of weeks later, Austin returned to the same store and sold more jewelry, this time getting about $7,000.00 and giving defendant $4,000.00.
Austin regularly used this jewelry store to sell the merchandise he stole. When the police went to the jewelry store, they found a large quantity of gold melted down in the back of the store. Only one recognizable piece was recovered which belonged to the Lipseys.
According to Austin, he had committed about seventy-six burglaries since 1989 before being caught by the police. As part of a plea agreement, he pled guilty and agreed to testify against defendant. The agreement specified a sentence of twenty-five years; the State agreed not to file a habitual offender bill against Austin and agreed not to prosecute him in any pending case.

REFUSAL TO ALLOW DEFENDANT TO CALL THE VICTIMS TO TESTIFY AT PRELIMINARY EXAMINATION
Defendant claims the court erred when it granted the State's motion to quash subpoenas issued at defendant's request for the Lipseys to testify at the preliminary examination. During the preliminary examination, when defendant called Mr. Lipsey as a witness, the State objected and moved to quash the subpoenas. After concluding defendant was attempting a "fishing expedition," the court granted the State's motion.
At a preliminary hearing, both the State and the defendant may produce witnesses, and the witnesses are subject to cross-examination. La.C.Cr.P. art. 294. A trial court commits error if it refuses to allow a defendant to subpoena the victim to testify at the preliminary hearing. State v. Spears, 92-1701 (La.App. 1st Cir. 3/11/94), 634 So.2d 9, 10. However, errors alleged to have occurred at a preliminary hearing are moot after the defendant has been tried and convicted. State v. Herrin, 562 So.2d 1, 10 (La.App. 1st Cir.), writ denied, 565 So.2d 942 (La.1990).
If defendant felt his right to a preliminary hearing was abridged by the court's ruling, he should have asserted that right before trial by means of an application for supervisory review. The issue is now moot. Accordingly, the assignment of error presents nothing for our review.

USE OF LEADING QUESTIONS
In assignments of error numbers two, five, and six, defendant contends the court erred when it allowed the State to lead its witnesses.
Although defendant does not cite transcript pages or discuss the testimony in his brief, he included transcript pages with the assignments of error. In the second assignment of error, defendant asserts the court erred when it overruled his objection when the State asked Richard Lipsey, "What else happened that night?" This question was asked after Lipsey testified that he had gone to the police station after Raymond Austin's arrest and had told the officers Austin did not resemble the man who committed the *476 robberies. The court overruled defendant's objection, and Lipsey testified that, while at the police station, he identified a watch and some jewelry which were in Austin's possession at the time of the arrest.
In the fifth and sixth assignments of error, defendant maintains the court erred in overruling his objections to the State's use of leading questions during the testimony of Raymond Austin. In reviewing the transcript pages cited with the fifth assignment, we find two instances in which defendant objected on this ground. Explaining the reasons behind burglarizing the Lipsey residence, Austin indicated he and defendant needed cash: "Well, didn't have that much money. As far as myself, I had a few hundred dollars, stuff like that." When the State then suggested Austin got his money from selling stolen jewelry, defendant objected on the ground the prosecutor was testifying rather than asking questions. Before the court issued a ruling on the objection, the prosecutor rephrased the question and asked, "Did you have that money from selling stolen jewelry and stolen things?" Austin responded that the money he had was from selling stolen items. The State then asked, "Y'all didn't have any money at that time, you had debts, bills to pay?" Austin replied he had bills to pay and also needed money to buy Christmas presents. Defendant again objected for the same reason as before. The court did not actually rule on the objection but noted the witness had already answered the question.
In reviewing the transcript cited for the sixth assignment, we find three instances in which defendant objected on this ground. Austin testified that, shortly after the robberies, he sold half of the jewelry to Rick at Ricky's Creative Jewelry for $12,000.00 and, about two week's later, returned to Rick to sell the remaining half. The State then asked, "When you went back to Ricky's with the rest of the jewelry how much did you?" Defendant interrupted the question and objected on the ground the State was testifying. Defendant argued the witness had not testified he had returned to sell more jewelry. The court did not rule on the objection.
As the questioning continued, Austin repeated that he had returned to the jewelry store to sell some more of the jewelry and made about $7,000.00 on that trip. He also explained how he disposed of the other jewelry and admitted he bought some of the jewelry from defendant. The State then asked, "You kept a Rolex watch?" Austin testified affirmatively, and defendant objected on the ground the State was testifying. The court sustained the objection. The State then rephrased the question. The State also asked, "Did you keep anything else, like a religious medal, anything like that?" Again, Austin answered affirmatively, and defendant objected. The court sustained the objection, and the State rephrased the question.
Generally, leading questions should not be used on the direct examination of a witness. La.C.Evid. art. 611(C). A leading question is one suggesting the answer the witness is expected to give. The use of leading questions is largely within the discretion of the trial court, and only a clear abuse of discretion which prejudices the defendant's rights will justify the reversal of a conviction. State v. Leblanc, 618 So.2d 949, 960 (La.App. 1st Cir.1993).
After reviewing the transcript pages cited in the assignments of error, we conclude that the State's question at issue in the second assignment and the question cited in the sixth assignment concerning the amount of money Austin got when he returned to sell more items to the jeweler were not leading because they were not suggestive.
Although some of the State's questions referenced in the fifth and sixth assignments of error were leading, defendant did not object to some of these questions until after the witness had answered the questions. To preserve the right to appeal an erroneous trial court ruling related to the admission of evidence, the objecting party must make a "timely" objection and promptly move to admonish the jury. La.C.Evid. art. 103(A). See also La.C.Cr.P. art. 841. Thus, some of defendant's objections were untimely. See State v. Williams, 615 So.2d 1009, 1021 (La.App. 1st Cir.), writ denied, 619 So.2d 543 (La.1993).
*477 We also notice the court sustained defendant's objections to two of the questions cited in the sixth assignment of error, thus giving defendant the relief he sought. Additionally, the court did not rule on some of the other objections. When a defendant objects to the admission of testimony, it is incumbent upon him to seek a ruling from the court, especially where, as in this case, the State immediately rephrases the question in response to the objection. Absent a ruling by the court or a refusal by the court to rule, there is nothing for this court to review. See generally State ex rel. Clark v. Marullo, 352 So.2d 223, 228 (La.1977). Furthermore, defendant does not allege, and we fail to see, how any substantial right of defendant was affected by these portions of the testimony. See La.C.Evid. art. 103(A).
These assignments of error are without merit.

DENIAL OF MOTION FOR MISTRIAL
Defendant contends the court erred when it denied his motion for mistrial. He argues that, because the State led him to believe the victims would not be able to identify him, prejudicial error warranting the granting of a mistrial occurred when Richard Lipsey identified him during trial.
Article 775 of the Louisiana Code of Criminal Procedure authorizes the granting of a mistrial for prejudicial conduct. The article provides in part:
Upon motion of a defendant, a mistrial shall be ordered, and in a jury case the jury dismissed, when prejudicial conduct in or outside the courtroom makes it impossible for the defendant to obtain a fair trial, or when authorized by Article 770 or 771.
The determination of whether a mistrial should be granted under article 775 is within the sound discretion of the trial judge, and denial of a motion for mistrial will not be disturbed on appeal without an abuse of that discretion. State v. Smith, 433 So.2d 688, 696 (La.1983). The motion should be granted only where a defendant suffers such substantial prejudice that he is deprived of any reasonable expectation of a fair trial. State v. Smith, 418 So.2d 515, 522 (La.1982).
Prior to trial, defendant filed a discovery motion seeking information about how he was identified as the perpetrator. The State responded that the codefendant had identified defendant. At the second preliminary examination District Attorney Doug Moreau testified the State's evidence of defendant's identity was from Raymond Austin. Moreau also indicated that the victims had not been able to see the intruder's face but that Mr. Lipsey had said the physical stature of defendant was the same as the stature of the intruder. When defendant attempted to call Mr. Lipsey as a witness at the hearing, the assistant district attorney argued defendant should not be allowed to call the victims as witnesses because they were not able to identify defendant. The prosecutor explained that because the intruder wore a mask, the victims had not seen his face.
At trial, Mrs. Lipsey testified she could not tell for sure if the man pointed out to her in court was the person who had robbed her. However, Mr. Lipsey testified he was ninety-percent certain that defendant was the intruder. Mr. Lipsey admitted it was difficult for him to make an identification. He acknowledged he had seen defendant in court on the previous day during jury selection, as well as several months earlier during a bail bond hearing. He also had seen defendant on the night of his arrest.
After Mr. Lipsey made the in-court identification, defendant moved for a mistrial. Outside the jury's presence, defendant argued the State's response to defendant's discovery motion and comments made by the prosecutor at the second preliminary examination led him to believe only the codefendant would be able to identify him. He claimed he was prejudiced by the identification because he would have presented a different defense had he known Mr. Lipsey was going to identify him. In response, the prosecutor insisted he had never been sure if Mr. Lipsey would be able to identify defendant. After seeing defendant in court on the previous day (including looking at defendant closely during a "staring contest" which took place between him and defendant), Mr. Lipsey told the prosecutor he thought he would be able to make an identification. Defendant's *478 attorney conceded the prosecutor had not tried to intentionally mislead the defense. The trial court noted the discovery statutes do not require the State to inform the defense about identification procedures and denied the motion for mistrial.
The discovery rules of the Louisiana Code of Criminal Procedure are intended to eliminate unwarranted prejudice which could arise from surprise testimony. Discovery procedures enable the defendant to properly assess the strength of the state's case against him in order to prepare his defense. If a defendant is lulled into a misapprehension of the strength of the state's case by the failure to fully disclose, such prejudice may constitute reversible error. State v. Johnson, 604 So.2d 685, 691 (La.App. 1st Cir. 1992), writ denied, 610 So.2d 795 (La.1993). The articles regulating discovery do not specifically require the state to provide information concerning a witness's ability to identify the perpetrator, and a defendant has no general constitutional right to unlimited discovery in a criminal case. See La.C.Cr.P. arts. 716-723; State v. Brossette, 93-1036 (La.App. 3d Cir. 3/2/94), 634 So.2d 1309, 1317, writ denied, 94-0802 (La. 6/24/94), 640 So.2d 1344.
Defendant claims the State misled him into believing the victims were unable to identify him. He asserts he would have used a different trial strategy and could have attacked the identification during a pretrial proceeding had he known one of the victims would be able to identify him. Nothing in the State's responses was designed to mislead defendant. Furthermore, and more importantly, defendant gave no indication how he might or could have altered his strategy had he known Mr. Lipsey was going to make an identification. After Mr. Lipsey's identification, defendant attacked it by showing Mr. Lipsey had never viewed a physical lineup or seen a photographic display and had not told anyone other than the assistant district attorney that he thought he could identify defendant.
We also note Mr. Lipsey clearly explained he was not 100-percent certain of the identification. However, Mr. Lipsey's description of the intruder remained consistent from the night of the robbery throughout these proceedings. He said the robber weighed 150 to 160 pounds, was five feet, seven inches tall, and had a medium strong build with a very dark complexion. He also testified that although the intruder wore a ski mask, his upper lip, nose, and eyes were closely visible during the robbery.
Under these circumstances, defendant suffered no substantial prejudice. His right to present a defense was not prejudiced adversely by the facts surrounding Mr. Lipsey's identification, and defendant's argument does not lead us to a viable alternative trial strategy. This assignment of error is without merit.

RELEVANCY OF EVIDENCE
Defendant argues the court erred when it permitted the State to ask immaterial and irrelevant questions.
Relevant evidence is defined as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." La.C.Evid. art. 401. Only relevant evidence is admissible. See La.C.Evid. art. 402. "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time." La.C.Evid. art. 403. In questions of relevancy, much discretion is vested in the trial court. Such rulings will not be disturbed on appeal in the absence of a showing of manifest abuse of discretion. State v. McCutcheon, 93-0488 (La.App. 1st Cir. 3/11/94), 633 So.2d 1338, 1343, writ denied, 94-0834 (La. 6/17/94), 638 So.2d 1093.
We have reviewed the transcript pages listed by defendant with this assignment of error and have found three instances in which defendant objected on the ground of relevancy. The first occurred during the testimony of Austin. Austin testified on direct examination that he had divorced during the previous year. The State asked Austin if it was correct he and his wife had experienced problems before the divorce, and defendant objected on the ground the evidence *479 was irrelevant. The trial court overruled the objection but indicated it would not allow extensive questioning on the topic. Austin then testified he moved out of the residence he shared with his wife and moved in with defendant at the end of October 1991. He explained that, prior to leaving his wife, his wife tape-recorded a telephone conversation he had with defendant wherein they planned a burglary and also discussed Austin's desires for another woman. After reviewing the testimony, we conclude the evidence introduced by the State was relevant to establish the connection between Austin and defendant and to show the two men lived together at the time of the offenses. This portion of the fourth assignment is without merit.
The second relevancy objection also occurred during Austin's testimony. While on direct examination, Austin described the deal he worked out with the State wherein he agreed to testify against defendant. He also defined a "rat" as a person who testified against someone else and said a rat was not treated well in prison. When the State asked Austin what his life was going to be like in prison as a rat, defendant objected that the proper foundation had not been laid.[1]
The State then asked Austin if he had seen how people who were rats were treated in prison, and defendant objected that the testimony was "immaterial and irrelevant." The court overruled the objection, and Austin testified while in prison he had seen people who were rats treated poorly. According to Austin, these people did not "live a real good life" because other prisoners want to fight or stab them. Austin also testified he already had experienced problems in the parish prison as a result of his agreement to testify against defendant. It is apparent from this testimony that the State's purpose was to show the risk Austin was taking by testifying against defendant. Such danger was relevant to bolster Austin's credibility, and, accordingly, the court did not err when it overruled defendant's relevancy objection.
The final instance cited by defendant in connection with this assignment occurred during the testimony of Doug Moreau, District Attorney for East Baton Rouge Parish. Moreau described the negotiations which took place between Austin and the State which resulted in Austin agreeing to testify against defendant. The State then asked Moreau if he became aware during the negotiations that Austin was a suspect in numerous burglaries. Defendant objected that the testimony was irrelevant. In response, the State argued it was presenting the testimony in response to defendant's cross-examination of Austin. The court overruled the objection.
We find no error in the court's ruling. On cross-examination, defendant repeatedly asked Austin about the number of burglaries he had committed and about the sentences he faced if convicted of those burglaries. For the jury to judge Austin's credibility, it was essential for them to be fully informed about the plea agreement. The State's apparent purpose in calling Moreau as a witness was to establish the details of the plea agreement.
Accordingly, assignment of error number four is meritless.

EVIDENTIARY RULING
Defendant claims the court erred when it overruled defendant's objection to the State's failure to lay a foundation for testimony by Austin concerning the special dangers "rats" faced in prison. We already have summarized this testimony in connection with our treatment of assignment of error number four. When the State asked Austin what his life was going to be like in prison as a result of having testified against defendant, Austin said he would have to "watch [his] back." Defendant interrupted and objected on the ground a proper foundation had not been laid because Austin had not yet been sent to prison and might be treated like a "king" for all he knew. The court overruled the objection.
Austin already had testified he had been to prison before and had demonstrated familiarity with prison life, especially insofar as the treatment of informers by other inmates.
*480 After the objection, the State specifically asked Austin if he had seen how "rats" were treated in prison. Austin testified that he had and that he already had been endangered at the parish prison as a result of his agreement to testify in this case. Thus, it is apparent his testimony was rationally based on his perceptions as a witness, and the court did not err when it overruled the objection. See La.C.Evid. art. 701.
This assignment lacks merit.

LACK OF FIRSTHAND KNOWLEDGE
Defendant argues the court erred when it allowed Austin to testify about his expected release date when he had no firsthand knowledge of that fact. After questioning Austin about the plea agreement and how he would be treated in prison after having testified against defendant, the State asked Austin if he knew when he would be released from prison. Defendant objected on the ground Austin was not an employee of the Louisiana Department of Public Safety and Corrections and thus was not qualified to determine his release date. Overruling the objection, the court commented that most of the time inmates know more about their release dates than the Department does. Austin then testified he did not know his exact release date but guessed it would be in 2003.
Prior to defendant's objection, Austin had testified that when he previously was in prison, he knew what his release date was going to be and that most prisoners basically knew when they would be released. Thus, he possessed sufficient firsthand knowledge of his expected release date and was qualified to answer the State's question. See La.C.Evid. art. 602. Moreover, insofar as the plea agreement affected Austin's credibility, the amount of time Austin expected he would be in prison was relevant, even if it turned out he was incorrect in his calculation. This assignment of error is without merit.

LIMITATION ON CROSS-EXAMINATION
Defendant claims the court erred when it sustained the State's objection to a question defendant asked Austin. On cross-examination, defendant quizzed Austin about the treatment informers receive in prison. Defendant then asked, "What happened if you would go to prison and people would think you are a rat and tell them, say, well, no, I wasn't the rat, say my partner was the one, I got somebody else I didn't like I wanted to get back, I got him convicted for that offense, whathow would they treat you" The State objected on the ground the question called for speculation, and the court sustained the objection. Defendant did not proffer testimony by Austin concerning the issue raised in this question. To preserve the right to appeal a trial court ruling which excludes evidence, the defendant must make the substance of the evidence known to the trial court. La.C.Evid. art. 103(A)(2). Because defendant failed to make a proffer, he is barred procedurally from advancing this assignment of error on appeal. See State v. Dixon, 620 So.2d 904, 909 (La. App. 1st Cir.1993).

SUFFICIENCY OF THE EVIDENCE
Defendant claims the evidence of his guilt was insufficient. At the hearing on the motion for new trial, defendant conceded the victims were robbed but denied he was the person who committed the robberies.
Defendant did not argue the issue of insufficiency before the trial court. The proper procedural vehicle for raising the sufficiency of the evidence is by first filing a motion for post-verdict judgment of acquittal before the trial court. La.C.Cr.P. art. 821. Nevertheless, we will consider a claim of insufficiency of the evidence which has been briefed pursuant to a formal assignment of error. State v. Leagea, 554 So.2d 833, 835 (La.App. 1st Cir.1989).
The standard of review for the sufficiency of the evidence to uphold a conviction is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude that the state proved the essential elements of the crime and the defendant's identity as the perpetrator of that crime beyond a reasonable doubt. See La.C.Cr.P. art. 821; State v. Johnson, 461 So.2d 673, 674 (La.App. 1st Cir.1984). Where the key issue raised by the defense is defendant's identification as the perpetrator rather than whether the crime *481 was committed, the state is required to negate any reasonable probability of misidentification. State v. Richardson, 459 So.2d 31, 38 (La.App. 1st Cir.1984).
After reviewing the trial testimony and evidence, we conclude defendant's claims are without merit and his identification as the perpetrator was established beyond a reasonable doubt. Austin identified defendant as being the person who assisted him in breaking into the residence and as the person who remained behind to confront the victims. When Austin was arrested, he was in possession of items stolen from the Lipseys, and he knew details about the offenses that only the intruder or someone who had talked to the intruder would know. However, Austin did not match the physical description of the intruder, and Mr. Lipsey specifically told the police that Austin was not the man who robbed him. Defendant matched the descriptions provided by the victims.
At the trial, Mrs. Lipsey was unable to identify her attacker, but Mr. Lipsey qualifiedly identified defendant in court. Mr. Lipsey had not been asked to view either a photographic display or a physical lineup, but he provided a detailed description of the intruder and was consistent in his description. During the offenses, he was aware he would later be asked to identify the robber, and he was careful to note the robber's characteristics when the man's mask was partially off.
Significant circumstantial evidence also connected defendant to the robberies. During the search, officers found several items stolen from the victims in defendant's bedroom. Additionally, a watch defendant claimed to own was identified as belonging to Mr. Lipsey, and guns found in the trunk of defendant's car belonged to Mr. Lipsey.
The evidence which identified defendant as the perpetrator of the robberies was substantial and convincing. This assignment of error lacks merit.

DENIAL OF MOTION FOR NEW TRIAL
Defendant argues a new trial should have been granted because the verdict is contrary to the law and evidence, the court's ruling on a written motion or objection shows prejudicial error, and the ends of justice would be served by the granting of a new trial. See La.C.Cr.P. art. 851(1), (2), (5). An assignment of error based on the refusal of the trial court to grant a new trial on grounds that the verdict was contrary to the law or evidence or that the ends of justice would be served by granting a new trial presents nothing for appellate review. See State v. Spears, 504 So.2d 974, 979 (La. App. 1st Cir.), writ denied, 507 So.2d 225 (La.1987); State v. Korman, 439 So.2d 1099, 1101 (La.App. 1st Cir.1983).
Defendant also claims prejudicial error resulted from the court's ruling on a written motion or objection, but cites no particular error. This assignment of error is without merit.

EXCESSIVE SENTENCE
Defendant contends the court erred when it deviated from the recommended sentencing range of the Felony Sentencing Guidelines. Defendant was sentenced after the effective date of the new sentencing guidelines and recent revisions to sentencing provisions in the Code of Criminal Procedure.
The record clearly shows that the trial court enumerated its reasons for deviating from the guidelines. We find those reasons convincing, especially the trial court's observation that the victims suffered extremely because of the way they were treated, especially when defendant could have left after the robbery was over but came back four or five times to further terrorize his victims. We find no error in the trial court's sentences under the extreme facts of this case.

PATENT ERROR
In reviewing the record for patent error, we notice the minutes do not indicate the judge ordered the sentences to be served without benefit of parole, probation, or suspension of sentence, as required by Louisiana Revised Statute 14:64(B). However, the transcript reveals the court properly sentenced defendant. In the event of a discrepancy between the minutes and the transcript, the transcript prevails. See State v. Lynch, 441 So.2d 732, 734 (La.1983). Accordingly, there is no error in the sentences, *482 but we remand and order the district court to amend the minutes and, if necessary, the commitment.
For these reasons, defendant's convictions and sentences are affirmed; however, we remand with instructions as aforesaid.
CONVICTIONS AND SENTENCES AFFIRMED; CASE REMANDED WITH INSTRUCTIONS AND ORDER.
NOTES
[1] This objection is the basis for assignment of error number seven.