STATE OF LOUISIANA,
v.
LESLIE J. PREJEAN, JR.
No. 2009 KA 0878.
Court of Appeals of Louisiana, First Circuit.
October 27, 2009.
Not Designated for Publication
RICKY L. BABIN, District Attorney SHAWN BUSH, DONALD D. CANDELL, Assistant District Attorneys, Counsel for Appellee State of Louisiana.
SHERRY WATTERS, Counsel for Appellant Leslie J. Prejean, Jr.
Before: DOWNING, GAIDRY and McCLENDON, JJ.
DOWNING, J.
The defendant, Leslie J. Prejean, Jr., was charged by bill of information with aggravated incest, a violation of La. R.S. 14:78.1. The defendant entered a plea of not guilty. The jury found the defendant guilty as charged. The trial court denied the defendant's motion for new trial. The trial court imposed a sentence of eight years imprisonment at hard labor. The trial court suspended three years of the sentence and placed the defendant under supervised probation for the three years with general and special conditions, including the payment of restitution to the victim and her family in the amount of four thousand six hundred forty dollars enrollment in a court-approved sex-offender treatment program, and individual psychotherapy. The trial court denied the defendant's motion to reconsider sentence. The defendant now appeals, assigning error as to the trial court's upholding of the State's Batson challenge, in denying the testimony of expert and character witnesses, in allowing hearsay testimony, and in imposing an excessive sentence. For the following reasons, we affirm the conviction and sentence.

STATEMENT OF FACTS
L.P., the victim, went to her grandparents' home on a daily basis when she was a young child and often stayed overnight.[1] According to the bill of information and statements by L.P., including her trial testimony, the incidents forming the basis of the conviction herein occurred when she was between the ages of six and eight years old. Specifically, on one occasion when she was about six years old her grandfather, the defendant, told her to close her eyes and open her hand, and put his "private" in her hand while they were in her grandmother's room.[2] After the defendant put his "private" in her hand, he told her to open her eyes and give him a hug. The victim's grandmother was taking a bath at the time.
The victim also stated that when she entered the defendant's bedroom to tell him goodnight, he asked her if she wanted to sleep with him. After receiving permission to do so from her grandmother, the victim slept with the defendant. According to the victim, the defendant placed her on top of him and "was pushing me up and down." The victim and the defendant were wearing clothing at the time. She stated that this was the first time she had slept in the same bed with her grandfather. She stated that the defendant committed the same act on another occasion when she slept with him, but added that the defendant's "private" was out and that he removed her underwear and his underwear on that occasion. She was also wearing a t-shirt at the time that was not removed. L.P. further indicated that the defendant taught her how to "French kiss" by putting his tongue in her mouth, and instructed her not to tell anyone or he would go to jail.
On another occasion, the defendant instructed the victim to place powder on his back, front, and "private" after he stepped out of the shower and was unclothed. She touched his "private" to rub the powder in. The victim further stated that she, her cousin, and a friend saw the defendant's "birdie" (a term she used synonymously with the word "private" and "weenie") sticking out of his pants zipper as he sat in a reclining chair. According to the victim, the defendant also tickled her, pulled her panties back and pinched and bit her on the buttocks one night when she was lying on the bed watching television. The defendant also pinched her on the buttocks on a separate occasion. She also said that once when she was trying to get out of the bed the defendant used his leg to pin her down.
L.P. stayed with her grandparents the full week of her mother's June 26, 2004 wedding. At some point during that week, she inadvertently hit the defendant's "private" when he was tickling her, and he instructed her to kiss and rub it to make it feel better. The defendant's "private" began "leaking" just before she complied. The defendant further told the victim to kiss his "butt" because she kicked it, and she complied.

FIRST ASSIGNMENT OF ERROR
In the first assignment of error, the defendant contends that the trial court erred in granting the State's Batson challenge and in demanding explanations for the exercise of peremptory challenges. The defendant argues that the State failed to prove purposeful discrimination and to meet the initial burden of making a prima facie showing that the defendant had discriminatory intent. The defendant further argues that the trial court erred in failing to accept the race-neutral explanation for the peremptory challenge of a juror.
The United States Constitution prohibits the State from engaging in purposeful discrimination on the grounds of race in the exercise of peremptory challenges. Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). It also prohibits the defendant from engaging in such conduct. Georgia v. McCollum, 505 U.S. 42, 59, 112 S.Ct. 2348, 2359, 120 L.Ed.2d 33 (1992). When the State makes an objection to the defense's challenge of prospective jurors, it is sometimes referred to as a "reverse-Batson objection." State v. Shepherd, 02-1006, p. 4 (La. App. 3rd Cir. 3/5/03), 839 So.2d 1103, 1106; see also La. C.Cr.P. art. 795C. If, the challenger makes a prima facie showing of discriminatory strikes, the burden shifts to the opposing party to offer race-neutral explanations for the challenged members. The neutral explanation must be one that is clear, reasonably specific, legitimate, and related to the particular case at bar. State v. Collier, 553 So.2d 815, 820 (La. 1989). If a race-neutral explanation is tendered, the trial court must decide, in step three of the Batson analysis, whether the challenger has proven purposeful discrimination. Purkett v. Elem, 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995) (per curiam).
The record herein reflects that before the State made its reverse-Batson objection, the defendant used three peremptory challenges to exclude three black prospective jurors, Raymond Ollis, Jr., Wakina Beasley, and Joseph Riney, and one peremptory challenge to exclude a white prospective juror, Carl Girouard. The State's motion took place just after the defense counsel stated that he would challenge Riney. After reviewing the race of the prospective jurors peremptorily challenged by the defendant, the trial court initially stated that it would deny the State's motion. Upon further inquiry, the trial court found that the State made a prima facie showing of discriminatory strikes and requested reasons for the strikes.
The combined factors needed to establish a prima facie case are: (1) the mover must demonstrate that the challenge was directed at a member of a cognizable group; (2) the mover must then show the challenge was peremptory rather than for cause; and (3) finally, the mover must show circumstances sufficient to raise an inference that the venire person was struck for being a member of that cognizable group. See State v. Givens, 99-3518, p. 5 (La. 1/17/01), 776 So.2d 443, 449. Regarding this third factor, any facts relevant to the question of the discriminatory intent may be offered to satisfy this burden. Such facts include, but are not limited to, a pattern of strikes against members of a suspect class, statements or actions (during voir dire) that support an inference that the exercise of peremptory strikes was motivated by impermissible considerations, the composition of the venire and of the jury finally impaneled, and any other disparate impact upon the suspect class that is alleged to be the victim of purposeful discrimination. See State v. Duncan, 99-2615, p. 14 (La. 10/16/01), 802 So.2d 533, 545, cert. denied, 536 U.S. 907, 122 S.Ct. 2362, 153 L.Ed.2d 183 (2002). We do not find the trial court abused its wide discretion in finding that the State established a prima facie showing of discriminatory strikes. At any rate, once a race-neutral explanation for a peremptory challenge is offered and the court has ruled on the ultimate question of intentional discrimination, the preliminary issue of whether there was a prima facie showing becomes moot. See Hernandez v. New York, 500 U.S. 352, 359, 111 S.Ct. 1859, 1866, 114 L.Ed.2d 395 (1991).
The burden shifted to defense counsel to offer race-neutral explanations for the challenged members. The defendant argues that the trial judge erred by not accepting his reasons as race neutral. The defense counsel initially stated that he needed time to prepare his race-neutral reasons and decided to withdraw his peremptory challenge of Riney. The trial court noted that this would not eradicate the requirement that he provide race-neutral reasons for the challenges. The defense counsel then noted that Ollis had grandchildren who were eight, six, and five years of age, and that the victim in the instant case was eight years of age at the time of the offenses. The trial court ultimately accepted the defense counsel's race-neutral reason for excusing Ollis.
The defense counsel explained that regarding an underage witness, Beasley stated that the questioning should be toned down. The defense counsel added that her statement suggests that she had sympathy for a child victim and this was his race-neutral reason for excusing her. The trial court rejected the defendant's raceneutral reason for excusing Beasley, and she was placed on the jury. The initial question by the defense that elicited the response by Beasley was in pertinent part as follows: "Do any of you think that a 12 year old . . . shouldn't be questioned by the defense ... should somehow be protected from questioning...?"
Prospective juror Victoria LeBlanc stated that the questioning should be at the child's level without the use of adult, graphic words. Similarly, Beasley stated, "I think they should be...I think they should use words to that child's level but a child will get confused." The defense counsel then asked, "But do you oppose them being questioned at all?" Beasley responded, "No" and there was no followup questioning.
A reviewing court owes the trial judge's evaluations of discriminatory intent great deference and should not reverse them unless they are clearly erroneous. State v. Handon, XXXX-XXXX, p. 5 (La. App. 1st Cir. 12/28/06), 952 So.2d 53, 58. Considering the record before us, particularly the transcript of jury selection, and in view of the vast amount of deference to be accorded to the findings of the trial judge in this context, we cannot conclude that the trial judge was clearly wrong in rejecting the defendant's explanation for challenging Beasley and in granting the State's reverse-Batson challenge with respect to Beasley, and in finding that purposeful racial discrimination motivated the peremptory challenge. Accordingly, the defendant's first assignment of error is without merit.

SECOND ASSIGNMENT OF ERROR
In the second assignment of error, the defendant contends that his constitutional rights to confront witnesses and present a defense were violated when the trial court refused to allow him to present testimony by four character witnesses and one expert witness. The defendant notes that he attempted to call the witnesses to rebut opinions and conclusions about the victim given by State witnesses, Detective Larvadain and Dr. Benton, and the State's cross-examination of the coroner, Dr. Chaudoir. The defendant argues that he was denied a fair trial and due process of law.

Character Witnesses
The defendant emphasizes that he called several character witnesses to testify during the trial and that each of them stayed within the bounds of proper character evidence requirements, testifying about the defendant's reputation in the community. The defendant contends that it would not have been cumulative or repetitive to call additional character witnesses to rebut the State's attack on the morality of the family and the allegations that he was a threat to the community.
After the defendant presented the testimony of four character witnesses and attempted to call a fifth, the State lodged an objection to the defense continuing to call character witnesses as repetitive, cumulative, and causing an undue delay in the trial. The defense attorney stated that he wanted to call five additional character witnesses. The defense explained that each of the witnesses'"knowledge of the defendant" was different. The defense further noted that one of the additional character witnesses, Lucien Caballero, had known the defendant his entire life. The trial court noted that the character witnesses who already testified consisted of a neighbor, a long-time friend, and the principal and a teacher from the school where the defendant worked. The additional character witnesses included a secretary and two other teachers from the school and another neighbor. The trial court allowed Cabellero to testify, but ruled that any further characterwitness testimony would be cumulative.
The State is correct in observing on appeal that the defendant did not proffer the substance of the testimony he sought to present by further character evidence. To preserve the right to appeal a trial court ruling that excludes evidence, the defendant must make the substance of the evidence known to the trial court. La.C.E. art. 103A(2); State v. Johnson, 00-0680, p. 11 (La. App. 1st Cir. 12/22/00), 775 So.2d 670, 678-79, writ denied, 02-1368 (La. 5/30/03), 845 So.2d 1066. Because the defendant failed to make a proffer, he is barred procedurally from advancing this assignment of error on appeal. See State v. Lynch, 94-0543, pp. 17-18 (La. App. 1st Cir. 5/5/95), 655 So.2d 470, 480, writ denied, 95-1441 (La. 11/13/95), 662 So.2d 466.
Moreover, in the exercise of judicial discretion, the trial court has the inherent authority to impose a reasonable limitation upon the number of character or reputation witnesses. This power has been declared to be essential to the proper administration of justice to avoid the unnecessary length of trials by the introduction of cumulative testimony. In limiting the number of character or reputation witnesses, the trial court must exercise a sound discretion in the context of the circumstances of the particular case, and caution should be exercised to prevent prejudice or injury to the litigants or accused. To warrant a reversal, the defendant must show that the trial court's action in limiting the number of character witnesses was an abuse of its discretion and affected substantial rights. State v. Edwards, 420 So.2d 663, 680 (La. 1982); La. Code Crim. P. art. 921. We find that the defendant has failed to make such a showing in this case.

Expert Witness
The defendant notes that Dr. Zimmerman, the potential defense expert witness, was preparing to testify as to the standards and generally accepted practices for questioning child victims and subtle means of influencing their statements. The defendant also urges that Dr. Zimmerman's testimony was relevant because there was no physical evidence, and the case was based on the victim's statements upon questioning. The defendant contends that the trial court incorrectly excluded Dr. Zimmerman's testimony in part because he did not have enough information about the victim to reach any opinions about her personally. The defendant notes that the jury requested Dr. Chaudoir's report during deliberations. The defendant contends that Dr. Zimmerman's testimony would have included the effects of questioning, time, age, and other influences on a child's statement, as State witnesses were allowed to do. The defendant argues that having Dr. Zimmerman's information to evaluate the evidence would have resulted in a different verdict. Thus, the defendant concludes that the conviction must be reversed and a new trial ordered.
The trial judge has wide discretion in determining the competence of an expert witness, and his ruling on a witness's qualification will not be disturbed absent an abuse of that discretion. State v. Trahan, 576 So.2d 1, 8 (La. 1990). In State v. Foret, 628 So.2d 1116, 1121-23 (La. 1993), the Louisiana Supreme Court clarified the trial judge's role under La. Code Evid. art. 702, which provides:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.
The Foret court cited State v. Catanese, 368 So.2d 975, 981-82 (La. 1979), and explained the trial judge, in ruling on the admissibility of scientific evidence, performs a "gatekeeping function in balancing the probative value of the evidence against its prejudicial effect." Foret, 628 So.2d at 1123.
The Foret court noted Article 702 was virtually identical to Fed. Rule Evid. 702, and carefully considered Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579, 592-95, 113 S.Ct. 2786, 2796-98, 125 L.Ed.2d 469 (1993), a case interpreting Fed. Rule Evid. 702. It adopted the guidelines set forth in Daubert for determining the reliability of expert scientific testimony. The Foret court explained that Article 702 required expert testimony to be both relevant and reliable. Foret, 628 So.2d at 1121-23.
In Daubert, the United States Supreme Court set a new standard to assist district courts in evaluating the admissibility of expert testimony. The new standard required the district courts to perform a "gate-keeping" function to "ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable." Daubert, 509 U.S. at 589, 113 S.Ct. at 2795. See also State v. Chauvin, XXXX-XXXX, p. 5 (La. 5/20/03), 846 So.2d 697, 700-01. In Kumho Tire Co., Ltd. v. Carmichael, 526 U.S. 137, 141, 119 S.Ct. 1167, 1171, 143 L.Ed.2d 238 (1999), the United States Supreme Court held that the analysis established by Daubert is to be applied to determine the admissibility of all expert testimony, not just scientific testimony. The Kumho Tire case dealt specifically with the issue of whether Daubert applies to engineering expert testimony.
Daubert established the following non-exclusive factors to be considered by district courts to determine the admissibility of expert testimony: (1) the "testability" of the scientific theory or technique; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error; and (4) whether the methodology is generally accepted in the scientific community. Daubert, 509 U.S. at 592-94, 113 S.Ct. at 2796-97. In Chauvin, our Supreme Court characterized the Daubert factors as "observations" that provide a "helpful guide for our lower courts in considering this difficult issue." Chauvin, 02-1188 at p. 5, 846 So.2d at 701.
As is evident from the nature of the above factors, the United States Supreme Court was concerned in Daubert with determining the admissibility of new techniques as a basis for expert scientific testimony. Foret, 628 So.2d at 1121. The Daubert factors are designed to "assist the trial courts in their preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and can properly be applied to the facts at issue." Chauvin, 02-1188 at 5, 846 So.2d at 701. Daubert requires that the reliability of expert testimony is to be ensured by a requirement that there be "a valid scientific connection to the pertinent inquiry as a precondition to admissibility." Foret, 628 So.2d at 1122 (quoting Daubert, 509 U.S. at 592, 113 S.Ct. at 2796). Daubert notes that Fed. Rule Evid. 702, the counterpart of La. C.E. art. 702, is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline. Daubert, 509 U.S. at 592, 113 S.Ct. at 2796.
The Daubert court was clearly not concerned with whether the expert is qualified solely by education to give opinion testimony concerning a particular matter. The United States Eleventh Circuit Court of Appeals has developed a three-part inquiry to more fully assist district courts in determining all the relevant issues related to the admissibility of expert testimony, with the Daubert analysis serving as one of the three prongs.
The three-prong inquiry was first set forth in City of Tuscaloosa v. Harcros Chemicals, Inc., 158 F.3d 548 (11th Cir. 1998), in which the court stated that the admission of expert testimony is proper only if all three of the following things are true: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in Daubert; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. Harcros Chemicals, 158 F.3d at 562. When the eleventh circuit adopted this three-part inquiry in Harcros Chemicals, it cited, inter alia, the United States Third Circuit Court of Appeals's decision in Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., Inc., 998 F.2d 1224, 1238 (3d Cir.), cert. denied sub nom, Moyer Packing Co. v. Petruzzi's IGA Supermarkets, Inc., 510 U.S. 994, 114 S.Ct. 554, 126 L.Ed.2d 455 (1993), in which the court set forth the same basic three-prong inquiry in a different way (to exclude such testimony), as follows: (1) if the testimony will not assist the trier of fact; (2) if scientific evidence is not sufficiently reliable; and (3) if the particular expert does not have sufficient specialized knowledge to assist the jurors.
The three factors set forth in the three-prong inquiry are derived directly from Fed. Rule Evid. 702 that is identical to La.C.E. art. 702. Further, both the third circuit in Petruzzi's IGA Supermarkets and the eleventh circuit in Harcros Chemicals cite language from Daubert in support of the inquiries they have established. Finding that it provides more comprehensive guidance to district courts determining the admissibility of expert testimony, the eleventh circuit's three-part inquiry was adopted in Cheairs v. State ex rel. Department of Transp. and Development, 03-0680, p. 10 (La. 12/3/03), 861 So.2d 536, 542.
Dr. Zimmerman is a medical psychologist and is board certified in forensic psychology. At the Daubert hearing, he stated that the defense wanted him to testify about the process in which the information was gathered in this case. Although he read statements, spoke to the defendant, and viewed medical reports and a videotape of an interview of the victim, Dr. Zimmerman had not spoken with the victim or those who questioned her before the trial. Dr. Zimmerman did not have any knowledge as to how information was acquired by the physicians in writing their reports. Dr. Zimmerman stated that it was not necessary that he speak with the victim and that there are certain general, accepted practices with abused children. Dr. Zimmerman testified that the deputy who questioned the victim used several leading questions and that the process was somewhat flawed. The trial court noted that the only questioning available for evaluation by Dr. Zimmerman was the videotape of questioning by the detective. The trial court questioned the benefit of Dr. Zimmerman's proposed testimony to the jurors. The trial court concluded that it would allow Dr. Zimmerman to testify as to the general questioning techniques that should be used but would not allow him to opine as to what happened in this case, as the record was incomplete as to the pre-trial questioning process. After the defense counsel questioned Dr. Zimmerman regarding his potential testimony, including his opinion as to questioning of the victim in this case, the trial court held that the doctor would not be allowed to testify, as the record was insufficient to support his opinion.
As noted above, the trial court initially ruled that Dr. Zimmerman could testify regarding general practices of questioning, but that he did not have or had not reviewed enough information to render an opinion about the effect of the questioning of the victim in this case. The defense continued its efforts to have such specific testimony ruled admissible. Dr. Zimmerman had not questioned interviewers or reviewed any interview of the victim other than the videotaped interview by the detective. The videotaped interview of the victim reviewed by Dr. Zimmerman was found inadmissible and was not played before the jury. We find no abuse of the trial court's exercise of its broad discretion in its determination not to allow Dr. Zimmerman to testify. This assignment of error lacks merit.

ASSIGNMENT OF ERROR NUMBER THREE
In the third assignment of error, the defendant contends that the State was allowed to impermissibly bolster the victim's credibility by presenting the hearsay testimony of Detective Larvadain and Dr. Benton as to the victim's statements. The defendant contends that none of the exceptions to hearsay were applicable. The defendant specifically notes that the victim's statements to the detective were not the first report of sexual assault or the best evidence, as a videotape of the statement was not played for the jury. The defendant further notes that Dr. Benton was not the victim's treating physician.
Hearsay is a statement, other than one made by the declarant while testifying at the present trial or hearing, offered in evidence to prove the truth of the matter asserted. La. C.E. art. 801C. Hearsay is not admissible except as otherwise provided by the Louisiana Code of Evidence or other legislation. La. C.E. art. 802.
On appeal the defendant argues that Detective Larvadain was allowed to repeat what the victim told her over defense objection. The defendant further notes that Dr. Scott Benton was allowed to testify as to what the victim told him. When the State asked Detective Larvadain what the victim told her, the defendant objected but did not state the basis for objection on the record though it apparently was based on hearsay. A non-transcribed bench conference was held and it appears that the trial court sustained the objection as the State revised the particular question. When the State subsequently asked Detective Larvadain if the victim told her anything that she alleged her grandfather may have done to her, the defense attorney objected on the basis that the questioning was leading. The trial court overruled the objection, and allowed the witness to answer the question. The answer included hearsay testimony regarding the defendant asking the victim to rub his "weenie" because she hurt it, in order to make it feel better.
At the outset, we note that a new basis for an objection cannot be raised for the first time on appeal. La.C.E. art. 103A(1); La.C.Cr. P. art. 841; State v. Cressy, 440 So.2d 141, 142-43 (La. 1983). The detective further testified regarding the defendant teaching the victim how to French kiss by putting his tongue in her mouth and how the defendant pinched, bit, and fondled her private area. The defendant did not object to the hearsay testimony. Dr. Benton testified that the victim described various acts by the defendant including making her touch and apply powder to his "weenie" and placing her on top of his "weenie." The defendant did not object to Dr. Benton's testimony. As the defense failed to lodge a contemporaneous objection to the testimony, he thus failed to preserve for review any alleged error in its admission. The defendant is precluded from raising these issues on appeal. La.C.E. art. 103A(1); see La.C.Cr.P. art. 841 A.
The defendant contends on appeal that he was entitled to a jury instruction regarding hearsay testimony. The record reflects that after a jury charge conference, defense counsel stated that he was satisfied with the jury instructions. Moreover, the testimony at issue was harmless in light of the testimony of the victim. The testimony was cumulative and corroborative of other testimony. Therefore, even if erroneous, the admission of the testimony at issue was harmless beyond a reasonable doubt. See La.C.Cr.P. art. 921; State v. Robertson, 603 So.2d 254, 257 (La. App. 1st Cir. 1992), writ denied, 92-2339 (La. 2/4/94), 633 So.2d 164. See also Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993). This assignment of error is without merit.

FOURTH ASSIGNMENT OF ERROR
The defendant contends that he was a 65-year-old, churchgoing family man with no criminal record. The defendant notes that he worked for McDermott for thirty-six years, and in retirement he worked for the Assumption Parish School Board as head custodian. Five people who knew the defendant from work and the community testified that he had a reputation for being of good moral character. The defendant argues that the record is devoid of support for the trial court's conclusions that there was an undue risk that he would commit another crime or that he was in need of a custodial environment. The defendant further contends that there was no evidence of significant personal injury as found by the trial court. The defendant notes that the victim was not physically harmed. The defendant also notes that there was no evidence of a threat to the safety of the general public, that he had health concerns including heart surgery, and that a lesser sentence will not lessen the seriousness of the crime. The defendant contends that the trial court failed to consider his responsibilities to his wife and dependents. The defendant argues that the sentence imposed by the trial court is grossly disproportionate to the offense and the offender and to similar offenses and offenders.
Article I, section 20, of the Louisiana Constitution prohibits the imposition of excessive punishment. The Louisiana Supreme Court in State v. Sepulvado, 367 So.2d 762, 767 (La. 1979), held that a sentence that is within the statutory limits may still be excessive. Generally, a sentence is considered excessive if it is grossly disproportionate to the severity of the crime or is nothing more than the needless imposition of pain and suffering. A sentence is considered grossly disproportionate if, when the crime and punishment are considered in light of the harm to society, it is so disproportionate as to shock one's sense of justice. State v. Hurst, 99-2868, p. 10 (La. App. 1st Cir. 10/3/00), 797 So.2d 75, 83, writ denied, 00-3053 (La. 10/5/01), 798 So.2d 962. A trial judge is given wide discretion in the imposition of sentences within statutory limits, and the sentence imposed should not be set aside as excessive in the absence of manifest abuse of discretion. Hurst, 99-2868 at pp. 10-11,797 So.2dat83.
The Louisiana Code of Criminal Procedure sets forth items that must be considered by the trial court before imposing sentence. La.C.Cr.P. art. 894.1. The judge is not required to list every aggravating or mitigating factor as long as the record shows ample consideration of the guidelines. State v. Herrin, 562 So.2d 1, 11 (La. App. 1st Cir.), writ denied, 565 So.2d 942 (La. 1990). The articulation of the factual basis for a sentence is the goal of Article 894.1, not to force a rigid or mechanical recitation of the factors. In light of the criteria expressed by Article 894.1, a review for individual excessiveness should consider the circumstances of the crime and the trial court's stated reasons and factual basis for its sentencing decision. State v. Mickey, 604 So.2d 675, 678 (La. App. 1st Cir. 1992), writ denied, 610 So.2d 795 (La. 1993). Thus, even without full compliance with Article 894.1, remand is unnecessary when the record clearly reflects an adequate basis for the sentence. State v. Lanclos, 419 So.2d 475, 478 (La. 1982); State v. Milstead, 95-1983, p. 8 (La. App. 1st Cir. 9/27/96), 681 So.2d 1274, 1279, writ denied, 96-2601 (La. 3/27/97), 692 So.2d 392; State v. Greer, 572 So.2d 1166, 1171 (La. App. 1st Cir. 1990).
At the time of the offense, the sentencing range statutorily prescribed for the offense of aggravated incest was a fine not to exceed $50,000.00 or imprisonment, with or without hard labor for not less than five nor more than twenty years, or both. La. R.S. 14:78.ID (prior to its 2006 amendment). In this case, the trial court sentenced the defendant to eight years imprisonment at hard labor and suspended three years of the sentence with probation conditions. Thus, the trial court imposed a sentence well within the statutory limits.
The trial court reviewed the presentence investigation report (PSI), reference letters submitted by the defendant, and victim-impact statements. The trial court noted that according to the PSI, the defendant did not have a criminal record, and the trial court considered the factors enumerated in La.C.Cr.P. art. 894.1. The trial court concluded that the defendant knew or should have known that the victim was particularly vulnerable or incapable of resistance due to her extreme youth and the defendant's position or status. The trial court noted the permanent effect of the defendant's actions on the victim. The trial court also considered the defendant's age, work status, social history, and the lack of a criminal record as mitigating factors. The trial court noted that the defendant failed to show any signs of remorse. We note that the sentencing comparisons made by the defendant are of little value. It is well settled that sentences must be individualized to the particular offender and to the particular offense committed. State v. Albarado, 03-2504, p. 6 (La. App. 1st Cir. 6/25/04), 878 So.2d 849, 852, writ denied, 04-2231 (La. 1/28/05), 893 So.2d 70; State v. Banks, 612 So.2d 822, 828 (La. App. 1st Cir. 1992), writ denied, 614 So.2d 1254 (La. 1993). We find that the record fully supports the imposition of the sentence herein.

DECREE
For the above reasons, we affirm the conviction and sentence.
CONVICTION AND SENTENCE AFFIRMED
NOTES
[1] The victim's date of birth is January 19, 1996. In accordance with La. R.S. 46:1844W, the victim's identity will not be disclosed herein to protect her privacy.
[2] The victim's grandparents had separate bedrooms.